820 So.2d 64 (2001)
Bobby R. SMITH, Jr., et al.
v.
Frances Ann SMITH.
1991878.
Supreme Court of Alabama.
June 22, 2001.
Rehearing Denied November 2, 2001.
*65 Guy V. Martin, Jr., of Martin, Rawson & Woosley, P.C., Birmingham; and Charles E. Robinson, Jr., of Robinson & Robinson, Ashville, for appellants.
Corey B. Moore and Billy R. Weathington, Jr., of Weathington & Moore, Moody, for appellee.
PER CURIAM.
This appeal concerns a dispute involving the sale of a parcel of land in St. Clair *66 County. The purchaser alleged that the defendant sellers breached the parties' contract and that those defendants, and other defendants, had subsequently committed fraud. The jury found in favor of the plaintiff on her breach-of-contract and fraud claims and also on the defendants' counterclaims, and the trial court entered a judgment on the jury's verdict. We affirm in part, reverse in part, and render a partial judgment for the defendants.

I.
In January 1996, Bobby Smith, Jr. ("Bobby"), met with either Paul Smith or his wife Frances Smith, or with both of them, and discussed the possibility that Paul or Frances or both of them would purchase a St. Clair County lot then owned by Bobby and his father, Bobby Smith, Sr.[1] The evidence was conflicting as to who participated in the negotiation with Bobby. Frances testified that she was involved in the negotiation and that, in fact, she was to be the purchaser of the property. Bobby testified that Frances did not participate in the negotiation and that, in fact, she had stayed in an automobile while he and Paul discussed the possible sale.[2] Paul testified by deposition that Frances "didn't participate that much," and that her participation was limited to "ask[ing] some questions." (C.R. at 302.)
Frances, Paul, and Bobby all testified that Bobby offered to sell the property for $12,500, and that, in addition to conveying title to the property, Bobby would, for that price, also install a septic tank, a water line, and a "power pole"; that he would spread gravel on the driveway; and that he would level part of the lot so that Paul and Frances could move a mobile home onto the lot. Frances testified that she and Bobby entered into an oral agreement for him to sell her the property on those terms. Bobby testified, however, that the agreement was between him and Paul. The parties did not reduce their agreement to writing.
Frances and Bobby agree that a "closing" meeting was scheduled for March 8, 1996, at the office of Alan Furr, a Birmingham attorney who was to serve as an escrow agent. Bobby, Bobby Smith, Sr., Frances, and Furr attended the meeting. Paul did not. At the meeting, Bobby and his father signed a deed transferring the lot to B.J. Development Company ("B.J. Development"). Bobby, acting as president of B.J. Development, then signed a deed transferring title to the property to Paul and Frances.[3] He tendered the deed to Furr.
*67 Furr presented Frances with a mortgage, a mortgage note, and other closing documents, all of which bore lines for her signature and Paul's signature. She testified that she told the others present: "I want [Paul's name] on the papers in case of my death, but I'm buying the land."[4] Paul testified by deposition that he and his wife intended for him to be "her beneficiary" and that he was willing to sign the documents to the extent that they made him his wife's beneficiary.[5] Frances signed the documents and tendered them to Furr. Paul never signed the documents, even though Furr asked Frances to have him come by and do so and even though Frances did, in fact, tell Paul he needed to go by and sign the documents.
*68 Furr held the deed and other closing documents in escrow pending Paul's signing. Because Paul never signed the documents, Furr never released them. He did, however, release $1,410 that Frances had paid at the closing. Furr testified that he disbursed that money to B.J. Development four days after the closing meeting.[6]
On April 15, 1996, Bobby wrote to Paul and Frances asking that Paul go and sign the documents. In August, Bobby again wrote to Paul and Frances, stating:
"I have been advised legally that if Mr. Smith does not sign the legal documents to close the transaction, that he is in default of failing to carry out with the sales transaction, therefore the land never being taken out of our name, because of Mr. Smith failing to sign, the land is still ours legally. This transaction can be considered null and void. In return for your down payment and any money spent in all fairness should be considered rent. Since you have lived there, and had your double wide on this land all this time.
"I believe in being fair and honest. I believe that six months time after a closing and being contacted and asked numerous times [in] writ[ing] and personally, is plenty of reasonable time for you to sign and execute the documents to make the land legally yours.
"I do not know what the problem is to why you have not signed the documents. After thirty days from the date of this letter if the transactions are not signed, I am considering this transaction null and void. I hope it does not come to this. Mr. Smith, it seems you do not want to sign and finalize this deal.... Will you please take immediate action on this matter?"
Frances testified that she and Paul never received either the April letter or the August letter.
*69 Frances and Paul made payments of $108 in May and June 1996, to the address stated in the mortgage note. In June, however, she received a letter directing her to make future payments to "CLEVELAND FARMS INC., P.O. BOX 27, WADLEY, ALA. 36276." The letter began with the salutation "Dear Landowner." It was on "B & B Smith Construction Co., Inc." ("B & B Construction"), letterhead stationery, and, although the letter carried no signature, printed at the bottom was the following: "Thank-you,/Bobby Smith/B & B Dev. Co." Bobby testified that his mother had sent out the letter and that she had used B & B Construction stationery because B.J. Development did not have any letterhead stationery. After receiving the letter directing them to do so, Frances and Paul sent their monthly payments to Cleveland Farms, Inc.
In September, the mobile home Paul and Frances had been living in was removed from the property.[7] After Bobby noticed that the mobile home was gone, he assumed that Frances and Paul had abandoned the property. On September 30, 1996, Bobby, on behalf of B.J. Development, sent a letter to Paul and Frances, stating:
"Please be advised that our sales agreement on the above-referenced property is null and void. Since Mr. Smith never executed the required mortgage loan documents to conclude this sales transaction, no transfer of title was made. Any and all monies paid by you in regard to this property is hereby considered rent for the time that you occupied the property."
On that same day, B.J. Development purported to sell the property to another couple, the Armstrongs.[8] Frances made two more monthly payments to Cleveland Farms after B.J. Development had purported to sell the lot to the Armstrongs. Frances drove by the land and saw that the Armstrongs' mobile home was on the lot; she testified that it caused her such distress that she saw a doctor and that the doctor prescribed "nerve pills." She also testified that she contacted an attorney. She stopped making monthly payments in November 1996.
On May 21, 1997, Frances sued Bobby, B & B Construction, B.J. Development, and Cleveland Farms, Inc.; the defendants answered and filed counterclaims.[9] The trial court disposed of most of the claims and counterclaims by entering judgments as a matter of law on behalf of the parties against whom the claims or counterclaims were asserted. Frances's only claims that *70 the trial court submitted to the jury were her claims of fraud, against all the defendants, and breach of contract, against Bobby and B.J. Development.
The jury found in favor of Frances on all of her claims that the trial court submitted to the jury. It awarded the following in damages:
(1) On her breach-of-contract claims, the jury awarded Frances $2,166 in compensatory damages from B.J. Development. Although it also found in Frances's favor against Bobby, it awarded her no damages on her breach-of-contract claim against him.
(2) On her fraud claims, the jury awarded Frances $10,000 in compensatory damages from Bobby and $30,000 each in compensatory damages from B & B Construction, Inc., B.J. Development, and Cleveland Farms, Inc. The jury also awarded her $50,000 each in punitive damages against B & B Construction, Inc., B.J. Development, and Cleveland Farms, Inc. The jury awarded Frances no punitive damages against Bobby.
The defendants' only claims that the trial court submitted to the jury were Bobby and B.J. Development's claims of fraud and breach of contract against Frances. The jury found in favor of Frances on those claims.
The defendants appeal only from that portion of the judgment based on the jury's verdict on Frances's claims against them.

II.
Bobby and B.J. Development argue that the trial court erred in denying their motion for a judgment as a matter of law on Frances's breach-of-contract claims. For the reasons discussed below, we disagree.
As a preliminary matter, we consider whether title to the property was ever transferred from B.J. Development to Frances and Paul. In the normal case, the Statute of Frauds requires that any contract for the sale of an interest in real property be in writing. See § 8-9-2(5), Ala.Code 1975.[10] As this Court has previously held, however, "[u]nder Rule 8(c), [Ala. R. Civ. P.,] the statute of frauds is an affirmative defense which must be specially pleaded. [A party's] failure to do so constitutes a waiver of that defense." Hughes v. Wallace, 429 So.2d 981, 983 (Ala.1983).
The contract for sale of the property at issue in this case was not in writing. However, because the defendants did not plead the Statute of Frauds as an affirmative defense, this Court will not consider the failure of the parties to reduce their agreement to writing as a defense to the plaintiff's breach-of-contract claims.
To effectuate a transfer of title to real property, Alabama statutory law requires that a deed be in writing, that the grantor sign the deed, and that it be attested to by at least one witness. See § 35-4-20, Ala.Code 1975.[11] Further, the *71 deed must be delivered to the grantee. See Williams v. Mobile Oil Exploration & Producing Southeast, Inc., 457 So.2d 962 (Ala.1984)[12]; see also Richard R. Powell and Patrick J. Rohan, 6A Powell on Real Property, ¶ 898[2][a] at 81A-74 (1991). The rule requiring the physical delivery of a deed, however, is not absolute. As Professor Powell has stated, a deed will be deemed to have been delivered when the grantor relinquishes it to a third party, such as an escrow agent, under circumstances where the grantor no longer has the power to recall the deed:
"In such a case, conveyance is complete as of the date of delivery. Since the grantor no longer has dominion or control over title to the premises, any change of mind on the part of the grantor is of no consequence, and any alteration or destruction of the deed is ineffective."
Powell, id. at 81A-80. However, it is well settled that, to meet the delivery requirement, it must be clear from the evidence that the grantor relinquished dominion over the deed. In Fitzpatrick v. Brigman, 130 Ala. 450, 455, 30 So. 500, 501 (1900), this Court stated:
"[T]he delivery must be so effectual as to deprive the grantor of the right to revoke it. For so long as he reserves to himself the locus penitentiae, there is no deliveryno present intention to divest himself of the title to the property.... [T]he grantor need not expressly reserve to himself this right to repent, but if his act upon which a delivery is predicated does not place the deed beyond his control, as a matter of law, then his right of revocation is not gone.
"... `The law does not presume, when a deed is handed to a third person, that it has been with the intention to pass title to the grantee. In order to make such an act a delivery to the grantee, the intention of the grantor must be expressed at the time in an unmistakable manner.'5 Am. & Eng. Encyc. Law (1st ed.), note 4, on p. 448."
See also Chandler v. Chandler, 409 So.2d 780 (Ala.1982), quoting Fitzpatrick.
At the closing meeting, B.J. Development, through its president, signed the deed transferring the property to Paul and Frances and tendered the deed to Furr, the escrow agent.[13] The deed was witnessed and met all the requirements of § 35-4-20, Ala.Code 1975. However, the *72 evidence does not demonstrate that the deed was ever delivered, either physically or constructively, to Frances and Paul.
As stated above, a deed may be deemed to have been "delivered" to the grantee, even though the grantee has not taken physical possession of the deed, if the grantor tenders the deed to a third party, such as an escrow agent, without the right to recall. However, to support a conclusion that a grantor's tender of a deed to a third party was sufficient to transfer title, "the intention of the grantor must [have been] expressed at the time in an unmistakable manner." Fitzpatrick v. Brigman, 130 Ala. at 455, 30 So. at 501 (emphasis omitted).
If the parties had entered into an escrow agreement, that agreement might have determined whether B.J. Development's delivery of the deed to Furr was without a right to recall the deed. The parties did not enter into an escrow agreement, however, and we must look to the evidence concerning the parties' actions and statements to determine whether B.J. Development, in transferring the deed to Furr, expressed an intent to pass title to Frances and Paul "in an unmistakable manner."
The only evidence tending to show that B.J. Development intended to part with dominion and control over the deed is the evidence that Bobby signed the deed on behalf of B.J. Development and handed it to Furr. On the other hand, Bobby clearly testified that he did not believe the closing would be complete until Paul signed the closing documents, and Furr testified that he was holding the deed in escrow pending Paul's signature. At the closing meeting, the parties discussed the need for Paul to sign the documents, and, in fact, Frances agreed to ask Paul to come to Furr's office to do so. Thus, in the absence of any additional evidence tending to show that B.J. Development intended to part with dominion and control of the deed before Paul signed the closing documents, we cannot conclude that the jury had before it substantial evidence indicating that the deed was delivered, even constructively, to Frances and Paul. We must conclude, therefore, that, as a matter of law, title to the property never passed from B.J. Development to Paul and Frances.
The parties disputed whether the contract required both Frances and Paul to sign the mortgage and the mortgage note. The defendants argued that the contract required that Paul sign the closing documents, and Frances argued that it did not require him to do so. Thus, whether Paul was required to sign the documents was a question for the jury to decide. The trial court therefore properly submitted Frances's breach-of-contract claim and the defendants' breach-of-contract counterclaim to the jury, which returned verdicts for Frances. Thus, the jury implicitly concluded that Paul was not, in fact, required under the contract to sign the closing documents, and that, when Frances signed the closing documents and tendered her down payment, she fulfilled her contractual obligations. The defendants' failure to deliver the deed to her amounted to a breach of contract. The jury's findings are supported by the evidence, and, therefore, we affirm the trial court's judgment in favor of Frances on the breach-of-contract claims and counterclaims.

III.
The defendants argue that the trial court erred in denying their motion for a judgment as a matter of law on Frances's fraud claims. For the reasons discussed below, we agree.
To state a claim of fraudulent misrepresentation, a plaintiff must allege facts *73 showing (1) that the defendant made a false representation; (2) of a material existing fact; (3) on which the plaintiff reasonably relied; and (4) which proximately caused injury or damage to the plaintiff. See Goodyear Tire & Rubber Co. v. Washington, 719 So.2d 774, 776 (Ala.1998); see also Foremost Ins. Co. v. Parham, 693 So.2d 409 (Ala.1997) (holding that the "reasonable-reliance" standard would apply to all fraud cases filed after March 14, 1997).
The trial court charged the jury that any fraud suggested by the evidence would have occurred after the closingin other words, that the alleged misrepresentations Frances complained of were contained in the "Dear Landowner" letters on B & B Construction letterhead instructing Frances to make payments to Cleveland Farms. Frances's theory of the case is that when she received those letters she was not in fact a landowner and that the defendants misrepresented to her that she was. In reliance on those alleged misrepresentations, she argues, she made payments to Cleveland Farms, although she was not a landowner and, in fact, that she made payments after B.J. Development had sold the property to another couplethe Armstrongs.
First, we address the claims against Bobby, B.J. Development, and B & B Construction. The record contains substantial evidence indicating that Bobby, B.J. Development, and B & B Construction misrepresented in the "Dear Landowner" letters a material fact, that Frances was a landowner; however, the defendants argue, and we agree, that Frances's reliance on the "Dear Landowner" letters was not reasonable.
This Court has stated:
"`Because it is the policy of courts not only to discourage fraud but also to discourage negligence and inattention to one's own interests, the right of reliance comes with a concomitant duty on the part of the plaintiffs to exercise some measure of precaution to safeguard their own interests. In order to recover for misrepresentation, the plaintiffs' reliance must, therefore, have been reasonable under the circumstances.'"
Foremost Ins. Co. v. Parham, 693 So.2d 409, 433 (Ala.1997) (quoting Torres v. State Farm Fire & Cas. Co., 438 So.2d 757, 758-59 (Ala.1983)[14]). As this Court has recently stated: "A person has a duty to read the documents related to a particular transaction." Brushwitz v. Ezell, 757 So.2d 423, 430 (Ala.2000). The closing documents that Frances signed contained blank spaces for her husband to sign; the blank spaces put her on notice that the closing documents were not complete without his signature. Further, Frances testified that Furr asked her to have her husband go to Furr's office to sign the documents and that she agreed to have him do so. Frances testified that she did, in fact, ask her husband to go to Furr's office and to sign the documents. In light of these facts, we conclude that "a reasonably prudent person who exercised ordinary *74 care would have discovered the true facts," Torres, supra, 438 So.2d at 759, specifically the fact that the defendants did not consider the sale to have closed and that title to the property had not passed to Frances and Paul. Accordingly, Bobby, B.J. Development, and B & B Construction were entitled to a judgment as a matter of law on Frances's fraud claims.
Finally, we address Frances's claim against Cleveland Farms. No evidence in the record indicates that Mr. Cleveland, or any agent of Cleveland Farms, participated in the writing or sending of the "Dear Landowner" letters. Further, no evidence in the record indicates that Mr. Cleveland or any agent of Cleveland Farms in any way authorized the letter, ratified it after the fact, received a copy of it, or even knew of its existence. Nothing in the record indicates that Cleveland Farms ever had any direct contact or communication with, or otherwise made any representation to, Paul or Frances. Accordingly, the record is insufficient to support the judgment as to Cleveland Farms. Cleveland Farms was entitled to a judgment as a matter of law.

Conclusion
We affirm the judgment to the extent it is based on the jury's verdict in favor of Frances Smith on her breach-of-contract claims. We reverse the judgment to the extent it is based on the jury's verdict in favor of Frances Smith on her fraud claims, and we render a judgment in favor of all defendants on those claims.[15]
AFFIRMED IN PART; REVERSED IN PART; AND JUDGMENT RENDERED ON FRAUD CLAIMS.
HOUSTON, SEE, BROWN, HARWOOD, WOODALL, and STUART, JJ., concur.
LYONS, J., concurs in the result.
MOORE, C.J., and JOHNSTONE, J., concur in part and dissent in part.
MOORE, Chief Justice (concurring in part and dissenting in part).
I concur in the main opinion insofar as it affirms that portion of the judgment based on the jury verdict in favor of Frances Smith on the breach-of-contract claims and insofar as it reverses that portion of the judgment against Cleveland Farms and insofar as it renders a judgment for Cleveland Farms. However, I dissent from the reversal of that portion of the judgment based on the jury's verdict finding fraud against the remaining defendants, because I conclude that Frances Smith proved sufficient facts to support her claim of fraudulent misrepresentation.
JOHNSTONE, Justice (concurring in part and dissenting in part).
I concur to affirm the contract judgment in favor of the plaintiff and to reverse and to render the fraud judgment against Cleveland. I dissent, however, from reversing the plaintiff's fraud judgment against the other defendants.
The jury implicitly found that the plaintiff had fully performed her obligations under the contract to buy and to sell so as to be due the consummated conveyance, which would have constituted her a "landowner" as represented by the defendants (except Cleveland). Therefore we cannot rightly hold that she did not reasonably believe she was a "landowner" when these *75 defendants told her she was. That is, because the jury implicitly found she should actually have been constituted a landowner, we cannot correctly say she should not have believed she was a landowner when these defendants told her she was.
NOTES
[1] Neither Paul Smith nor Frances Smith is related to Bobby Smith, Jr., or Bobby Smith, Sr.
[2] Bobby testified:

"A. If you will notice on the deed, Paul Smith's name was first because that is who I negotiated the verbal deal with. Alan [Furr, the escrow agent,] told [Frances, at the closing,] that without Paul signing the documents, the deal couldn't close.
". . . .
"Q. [By Mr. Martin, defense counsel] At any time did you negotiate with Mrs. Frances Smith concerning the sale of this lot?
"A. No, sir. Just like she said in her deposition, she said it was cold and raining and she sat in the car that day while we talked."
(R.T. at 171-74.)
[3] The deed read, in part:

"KNOW ALL MEN BY THESE PRESENTS, that in consideration of TWELVE THOUSAND FIVE HUNDRED and NO/100 DOLLARS ($12,500.00) and other good and valuable consideration to the undersigned grantor, BJ DEVELOPMENT CO., INC.,... the said grantor does by these presents grant, bargain, sell and convey unto PAUL M. SMITH and wife, FRANCES ANN SMITH, for and during their joint lives and upon their death to either of them, then to the survivor in fee simple,....
"SUBJECT TO THE FOLLOWING:
". . . .
"$11,250 of the purchase price recited herein is paid by purchase money mortgage executed simultaneously herewith."
(C.R. at 282.)
[4] She also testified:

"A. They asked me if I wanted my husband put on there. I said `Yes.' But I was there to close it. I was there to sign it. I was there to be responsible for the payments.
"Q. What makes you think that you had closed?
"A. Because the lawyer said, `This is closing. Sign this, and this is it.'
"Q. But you testified that they told you that your husband had to come sign?
"A. If I wanted himin case of my death, to befor it to go to.
"Q. So you are saying thatI mean you are aware that several people asked you to have your
"A. No, sir.
"Q. husband come down?
"A. No, sir.
"Q. If Susan swears under oath that she called and said `We can't close'
"A. At the closing they said, `Have your husband' the attorney said this one time. That's it. Not several people."
(R.T. at 335.)
[5] Paul testified:

"Q. [By Mr. Martin, defense counsel] Okay. Well, did you ever see the closing documents?
"A. Yes.
"Q. When did you see them?
"A. After the wife brought them home and I got off the road. [Paul was employed as a truck driver.]
"Q. Did you read them?
"A. To some extent, yes.
"Q. Were you willing to sign them?
"A. As far as being beneficiary, yes. Of course, I'd want them to put my name on them, in case anything happened to her.
"Q. Well, let's look at the promissory note that you've seen, and we've marked as Defendants' Exhibit 2. Is that a copy of the note that you saw?
"A. Uh-huh. (Indicating yes.)
"Q. Okay. But you say you saw the note.
"A. I believe this is the same one, yes.
"Q. Okay. Well, if you signed the note, was it not your understanding that you would be liable with your wife for the debt?
"A. It was my understanding from the beginning, I assumed that, that anyanything, being married, or that anything I signed, she'd be responsible for; anything she signed, I'd be responsible for."
(C.R. at 303.) He also testified:
"Q. [By Mr. Martin, defense counsel] Okay. Now let's talk about title. Now, whose name was the title supposed to be in?
"A. I don'tI'm not privy to that.
"Q. You don't know?
"A. I was not privy to that.
"Q. Okay. I'm asking you, do you know or not; not whether you were privy to that.
"A. That's knowledge. I had no knowledge of that.
"Q. You have no knowledge
"A. Of that.
"Q. Of whose name title was to be in?
"A. No. I would assume it would be the purchaser.
"Q. And who was the purchaser?
"A. My wife.
"Q. And you were not supposed to be the purchaser?
"A. No. I was supposed to be beneficiary." (Footnote cont'd.)
(C.R. at 306.)
[6] Furr testified:

"Q. [By Mr. Weathington, plaintiff's counsel] Normally, if you are going to put that deed in escrow, you are going to keep her money in escrow too, aren't you?
"A. That would be the normal, yes.
"Q. But for whatever reason, for some reason, this money was paid out to the Smiths either on Monday or Tuesday following the closing?
"A. That's correct.
"Q. And the deed was still in that escrow envelope?
"A. Right.
"Q. But the money is out?
"A. Right.
"Q. I think during some conversation or some study of this case and the documents, I recall that maybe the money was paid by mistake of one of your staff. Is that right?
"A. The only person handling that would have been Susan Johnson, and it appears that she released the money.
"Q. And I read in your affidavit where you said the money was released because Mrs. Smith didn't have any real problem with that.
"A. There was some conversations about the work that had been done. I don't remember the dollar amount. It was a driveway with a septic tank. I think they had set the utility pole. There had been some discussionseems like Bobby was holding a check that had been given to him early on by them, and was asked to hold it until they could come up with funds to pay. There was some discussion about the work that had been done and the cost of it. There is a recollection there was some discussion about whether or not to release it. I don't think it was released that afternoon. It appears it was on Monday or Tuesday.
"Q. Is it fair to summarize it by saying there was no heartburn about releasing the money and holding the deed?
"A. Yeah. At the closing, I don't recall having the feeling that anybody really cared. I do recall there being the conversation about Paul and Frances were already living there. As the closing attorney, it would not have been my normal course of dealings to have released it at that time."
(Footnote cont'd.)
(R.T. at 81-82.)
[7] The parties dispute the reason the mobile home was removed. Frances testified that she "conveyed" the mobile home back to the seller. Bobby Smith testified that the mobile home had been removed by the company that had financed Frances and Paul's purchase of the mobile home.
[8] The Armstrongs moved onto the property, but they later moved from it.
[9] Frances stated claims of breach of contract, fraud, conversion, the tort of outrage, and breach of warranty of title. The defendants' counterclaims alleged breach of contract, negligence, fraud, and abuse of process, and sought a judgment declaring that no valid sale had occurred and that the moneys paid by the plaintiffs were rental payments and not mortgage payments.

The action was initially filed in the names of both Frances and Paul. At some point after they had sued, however, they separated. The trial court granted the plaintiffs' counsel leave to withdraw from his representation of Paul. At the close of all the evidence, the trial court entered a judgment in favor of the defendants and against Paul, in the amount of $50,000. Paul did not appeal.
Bobby Smith, Sr., was initially named as a defendant. It appears from the record that the trial court dismissed him before submitting the case to the jury.
[10] Section 8-9-2, our version of the Statute of Frauds, provides:

"In the following cases, every agreement is void unless such agreement or some note or memorandum thereof expressing the consideration is in writing and subscribed by the party to be charged therewith or some other person by him thereunto lawfully authorized in writing:
". . . .
"(5) Every contract for the sale of lands, tenements or hereditaments, or of any interest therein, except leases for a term not longer than one year, unless the purchase money, or a portion thereof is paid and the purchaser is put in possession of the land by the seller...."
[11] Section 35-4-20 provides:

"Conveyances for the alienation of lands must be written or printed, or partly written and partly printed, on parchment or paper, and must be signed at their foot by the contracting party or his agent having a written authority; or, if he is not able to sign his name, then his name must be written for him, with the words `his mark' written against the same, or over it; the execution of such conveyance must be attested by one witness or, where the party cannot write, by two witnesses who are able to write and who must write their names as witnesses; or, if he can write his name but does not do so and his name is written for him by another, then the execution must be attested by two witnesses who can and do write their names."
[12] The Williams case is so styled in Southern Reporter 2d. The appellee's name was misspelled there. The records of this Court indicate the case was actually styled Williams v. Mobil Oil Exploration & Producing Southeast, Inc.
[13] Although he had long served as an attorney for Bobby, Bobby Smith, Sr., and their companies, it appears undisputed that Furr was acting as an escrow agent. Furr testified:

"Well, in this particular closing, we wound up moving from the closing attorney's position to an escrow type position, where basically I was holding the documents in trust until Mr. Smith came in to sign them."
(R.T. at 73.)
[14] In Hickox v. Stover, 551 So.2d 259 (Ala. 1989), this Court overturned a 140-year-old standard for determining reliance in fraud casesa standard represented by Torres. The Hickox experiment, however, was relatively short-lived, ending eight years later when this Court overturned Hickox in Foremost Insurance Co. v. Parham, 693 So.2d at 421, stating:

"After careful consideration, we conclude that the `justifiable reliance' standard adopted in Hickox, which eliminated the general duty on the part of a person to read the documents received in connection with a particular transaction (consumer or commercial), should be replaced with the `reasonable reliance' standard most closely associated with Torres v. State Farm Fire & Casualty Co., 438 So.2d 757 (Ala.1983)."
[15] The trial court's judgment for the defendants and against Paul was not appealed to this Court.