Auto-Owners Insurance Company ("Auto-Owners") appeals from a judgment entered on a jury verdict in favor of its insured, David Abston. The $1 million judgment stems from Abston's claims of breach of contract, bad-faith failure to pay, and fraud relating to Auto-Owners' duty to pay $2,000 in medical expenses under its insurance contract with Abston. Auto-Owners argues that it was entitled to a judgment as a matter of law as to each of these claims and that the trial judge erred in submitting the claims to the jury. We agree, and we reverse and render a judgment for Auto-Owners.
Our review of the trial court's denial of Auto-Owners' motion for a judgment as a matter of law is governed by the principles recently discussed in Ex parte Meadowcraft Industries, Inc., 817 So.2d 702, 706
(Ala. 2001):
 "`We review a trial court's denial of a motion for a judgment as a matter of law by the same standard we applied to an order denying the motion formerly known as a motion for a directed verdict. Winn Dixie of Montgomery, Inc. v. Colburn, 709 So.2d 1222, 1223 n. 1 (Ala. 1998). "The standard of review applicable to a directed verdict or to a denial of a motion for a directed verdict is whether the nonmoving party has presented substantial evidence in support of his position." K.S. v. Carr, 618 So.2d 707, 713 (Ala. 1993). "Substantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer *Page 1189 
 the existence of the fact sought to be proved." West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989). We have held:
 "`"Upon review of a motion for a directed verdict or a [judgment notwithstanding the verdict], evidence must be viewed in the light most favorable to the nonmoving party, and if reasonable inferences in favor of the plaintiff's [nonmovant's] claim can be drawn from the evidence, the motion must be denied. Zaharavich v. Clingerman, 529 So.2d 978, 980 (Ala. 1988)."
 "`Woodruff v. Johnson, 560 So.2d 1040, 1041 (Ala. 1990).'"
Quoting Fleetwood Enters., Inc. v. Hutcheson, 791 So.2d 920, 923 (Ala. 2000). Stated another way, in determining whether the nonmovant has presented "substantial evidence" for each element of each claim, we "will accept the tendencies of the evidence most favorable to the nonmoving party and will resolve all reasonable doubts in favor of the nonmoving party." Ex parte Breitsprecher, 772 So.2d 1125, 1129 (Ala. 2000).
The facts presented at trial, viewed in the light most favorable to Abston, the nonmovant, are as follows. On December 30, 1995, Abston was injured in a one-car accident. At the time of the accident, Abston had an automobile-insurance policy issued by Auto-Owners and a health-insurance policy issued by Congress Life Insurance Company ("Congress Life"). Abston's policy with Auto-Owners provided medical coverage with a $2,000 limit of liability. Abston was treated for his injuries at Rush Foundation Hospital ("Rush"), and Congress Life eventually paid most, but not all, of the medical expenses Abston incurred at Rush.
On July 29, 1996, Abston entered into an "Agreement for Reimbursement" with Congress Life (through Corporate Benefit Services of America ("CBSA"), which administers coverage under the policy). The agreement provided, in pertinent part:
 "In consideration of payment of Medical Benefits by CBSA (Formerly ABI), with respect to expenses incurred as a result of David Abston's accident of 12/30/95:
 "a.) I agree and intend to reimburse CBSA (Formerly ABI), to the extent of payment received from another for damages relative to the accident; and
 "b.) I agree to waive the limitation of any statute for the presentation of any claim for said reimbursement; and
 "c.) I agree that all the above-described medical benefits paid now or in the future by CBSA (Formerly ABI) will be secured relative to the accident; and
 "d.) I agree that CBSA (Formerly ABI) may, at its descretion, file this agreement with any third party, his or her agent, or the court; and
 "e.) I agree that this agreement shall apply regardless of whether damages are paid due to legal action, settlement in full or in part, or otherwise.
"Date: 7-29-96 Signature: /s/ David M. Abston"
Congress Life's investigative agency, J.W. Hutton, Inc., which was pursuing Congress Life's subrogation interests, sent this agreement (hereinafter referred to as "the subrogation agreement") to Abston's local insurance agency, Dansby, Evans Skipper Insurance Agency ("Dansby Evans"). Dansby Evans forwarded the subrogation agreement to William Barrett, the branch claims manager for Auto-Owners. A letter from J.W. Hutton accompanying the subrogation agreement stated that benefits to be paid by Congress Life were secondary to any benefits for medical expenses available to Abston through the Auto-Owners policy. Accordingly, the letter requested that, pursuant to the subrogation *Page 1190 
agreement, Auto-Owners pay Congress Life the amount due Abston under the Auto-Owners policy. It is undisputed that Abston himself never filed a claim with Auto-Owners, although Dansby Evans filed a loss form on his behalf with Auto-Owners on August 19, 1996.
On August 21, 1996, after Barrett received this information from J.W. Hutton, Barrett sent a letter to Abston; that letter stated:
 "Mr. Abston, We have received a request for reimbursement of paid medical expenses from Health Insurance (CBSA). In order [to] determine the circumstances, I need for you to complete the enclosed statement of accident and return it to me. Complete both sides. Also complete the enclosed Medical Authorization and return it. We will request the records pertaining to your 12-30-95 accident from Rush Foundation. If you have any questions call me at (334) 874-6065."
(Emphasis added.) Barrett attached a copy of the subrogation agreement to this letter. According to Abston, when he read the letter he took it to mean that payment would be collected first from Auto-Owners, but that eventually all of his medical bills would be paid. However, Abston did not interpret the letter to mean that Congress Life would keep the money it received from Auto-Owners.
As requested in Barrett's letter, Abston completed the statement-of-accident form and the medical-authorization form and returned them, along with a copy of the police report relating to the accident, to Auto-Owners. These materials demonstrated that Abston had been involved in a one-vehicle accident and, therefore, that no third party was at fault. While Abston did not telephone Barrett with any questions, it is undisputed that Abston met all of the conditions necessary to trigger Auto-Owners' obligation to pay under its policy with Abston.
Barrett used the medical authorization to obtain medical records from Rush, one of which appeared to indicate an outstanding balance of over $800. Barrett did not investigate to determine whether there were other outstanding bills.
After verifying that payment under the policy was appropriate, Barrett sent a check for $2,000 — the maximum amount of Auto-Owners' liability under the policy — to Congress Life "as subrogee of David Abston." According to Barrett, he paid the $2,000 to Congress Life in accordance with the information he had received, including (1) the statement from J.W. Hutton — with which Barrett agreed — that the Auto-Owners policy was required to pay first, and (2) the subrogation agreement, which Barrett claimed assigned to Congress Life the right to receive payments of benefits and which gave Congress Life a lien on any payments Abston would receive.
Abston was aware that there were some problems with the payment of his medical bills because he had been receiving collection notices from the hospital and from doctors who had treated him for the injures he sustained in the accident. Some time after he received Barrett's letter, Abston learned that Auto-Owners had made a $2,000 payment to Congress Life.[1] *Page 1191 
On November 10, 1997, Abston sued Congress Life, alleging breach of contract, bad-faith failure to pay, and fraudulent inducement. Abston included as defendants fictitiously named parties "John Doe, Richard Roe, ABC, Inc., and DEF, Inc." As to those fictitiously named defendants, Abston alleged:
 "Defendants, JOHN DOE, RICHARD ROE, ABC, INC., and DEF, INC., are fictitious parties whose true and correct names are otherwise unknown to the Plaintiff but who are intended to designate the corporation, partnership, and/or individual who sold the CONGRESS insurance policy to the Plaintiff and/or who made misrepresentations to the Plaintiff in order to induce the Plaintiff to purchase the CONGRESS insurance policy and whose true names or identities will be substituted by amendment when ascertained."
On May 6, 1999, Abston amended his complaint, adding Auto-Owners as a defendant and alleging that Auto-Owners was liable for breach of contract and fraudulent misrepresentation and/or suppression. On December 7, 1999, Abston once again amended his complaint, alleging against Auto-Owners negligence, wantonness, and bad-faith failure to pay.[2]
Following a jury trial, the trial court denied Auto-Owners' motion for a judgment as a matter of law and submitted the case to the jury. The jury returned a verdict against Congress Life, assessing damages in the amount of $500,000 in compensatory damages and $3.5 million in punitive damages,[3] and against Auto-Owners, *Page 1192 
assessing damages in the amount of $500,000 in compensatory damages and $500,000 in punitive damages. Auto-Owners appeals. For the reasons below, we hold that Auto-Owners was entitled to a judgment as a matter of law as to each of Abston's claims, and we reverse the trial court's judgment and render a judgment for Auto-Owners.
 I. Breach-of-Contract Claim
In order to survive a motion for a judgment as a matter of law with respect to his breach-of-contract claim, Abston must have presented, among other things, substantial evidence of a specific policy provision that Auto-Owners breached. In his brief, however, the closest Abston comes to identifying such a specific policy provision is his argument (1) that the policy must have been breached because the payment of $2,000 by Auto-Owners did not reduce Abston's medical bills by $2,000, and (2) that if the subrogation agreement is an assignment or a lien, then, by honoring the subrogation agreement, Auto-Owners violated the policy provision against assignments. These arguments are insufficient to support Abston's breach-of-contract claim.
Abston's first argument avoids the real issue. The issue is not whether Auto-Owners' payment to Congress Life reduced Abston's bills. Rather, the issue is whether Auto-Owners' payment was made in accordance with its policy and as directed by Abston's subrogation agreement with Congress Life.
Abston's policy with Auto-Owners states only that Auto-Owners will "pay reasonable expenses" for medical services:
 "a. We will pay reasonable expenses for medical and funeral services to or for any person:
"(1) who accidentally sustains bodily injury;
 "(2) while occupying or getting into or out of your automobile; and
 "(3) while your automobile is being used with your permission."
(Emphasis omitted.) The policy does not specifically require Auto-Owners to pay either Abston or Abston's medical providers directly. However, assuming that the conditions precedent are met (as they were in this case), the policy provides that Abston had a right to receive payment, in one form or the other, of up to $2,000 of medical expenses incurred by Abston and resulting from his accident.
The problem is that Abston effectively assigned his right to receive the payment from Auto-Owners when he signed the subrogation agreement.[4]
Under the terms of the agreement, Abston agreed that Congress Life had a valid claim on, and a right to pursue and receive, any amounts — regardless of how they were owed to Abston — that Abston would receive "from another" as a result of the accident. Abston also agreed that Congress Life's medical payments were "secured" and that Congress Life could file the subrogation agreement with any third party (such as Auto-Owners).
It is undisputed that after Congress Life received the signed subrogation agreement, Congress Life notified Auto-Owners of the agreement by sending it to *Page 1193 
Barrett. See Restatement (Second) of Contracts §§ 336, 338 (1979) (discussing the effects of notification on the rights and duties of obligors). While it would appear, therefore, that Abston made a valid assignment of his rights under the Auto-Owners policy, Abston's second argument is that this assignment itself supports his breach-of-contract claim against Auto-Owners. This argument also fails.
Abston's policy with Auto-Owners does provide that "[n]o interest in this policy may be assigned without our written consent." Abston argues that to the extent Auto-Owners honored Abston's assignment, Auto-Owners is in breach, because it had not consented to the assignment. This assertion, however, is a non sequitur. Even assuming that this provision was not limited to the assignment of insurance coverage from Abston to someone else, Abston's assignment of the right to payment could constitute a breach only on the part of Abston, not Auto-Owners. SeeRestatement (Second) of Contracts at § 322, cmt. d ("Ordinarily a contractual prohibition of assignment is for the benefit of the obligor. In such cases third parties cannot assert the invalidity of a prohibited assignment if the obligor makes no objection."). Accordingly, Auto-Owners' honoring of the assignment would constitute, if anything, a waiver of the consent requirement. Cf. Southland of Alabama, Inc. v.Julius E. Marx, Inc., 341 So.2d 127, 130-31 (Ala. 1976) (holding that a lessor, who knew of a lessee's assignment and who had accepted rent from the assignee, waived the lease's requirement that the lessor consent prior to subletting).
Abston dedicates much of the remainder of his breach-of-contract argument to attacking the logic of why he would spend extra for medical-payments coverage on his automobile-insurance policy if he had health insurance and to the argument that Barrett should have examined Abston's Congress Life policy and should have known that Abston did not want Auto-Owners to pay his medical benefits to Congress Life. Abston also attacks the validity of Congress Life's claim to the money and Congress Life's actions in acquiring and keeping the $2,000. While these matters might be relevant with regard to Abston's claims against Congress Life, they are simply not relevant to an analysis of Abston's breach-of-contract claim against Auto-Owners.[5]
We hold that Auto-Owners was entitled to a judgment as a matter of law with respect to Abston's breach-of-contract claim. Consequently, Auto-Owners was also entitled to a judgment as a matter of law with respect to Abston's claim of bad-faith failure to pay. See Koch v. StateFarm Fire Cas. Co., 565 So.2d 226, 231 (Ala. 1990) (holding that, in the normal case, a plaintiff must be entitled to a directed verdict on a breach-of-contract claim before he can maintain a bad-faith-failure-to-pay claim).
 II. Fraud Claims
In his brief to this Court, Abston argues that Auto-Owners was guilty of fraudulent misrepresentation because, he says, (1) Auto-Owners failed to follow its policy language, and (2) Barrett's August 21, 1996, letter stated that Barrett was going to "determine the circumstances" of Abston's *Page 1194 
claim. Abston also asserts that Auto-Owners fraudulently suppressed the fact that it paid the $2,000 directly to Congress Life, because Barrett never informed Abston that the payment had been made. We hold that Abston's fraud claims are barred by the statute of limitations; however, even if they were not time-barred, they have no merit.
 A. Statute of Limitations
In Alabama, any fraud claim must be brought within two years of the accrual of the claim. Ala. Code 1975, § 6-2-38(l). However, where § 6-2-38(l) has created a bar to a fraud claim, "the claim must not be considered as having accrued until the discovery by the aggrieved party of the fact constituting the fraud." Ala. Code 1975, § 6-2-3.
Abston cites Jim Walter Homes, Inc. v. Kendrick, 810 So.2d 645 (Ala. 2001), for the proposition that "`"[t]he question of when a plaintiff should have discovered fraud should be taken away from the jury and decided as a matter of law only in cases in which the plaintiff actuallyknew of facts that would have put a reasonable person on notice of fraud."'" 810 So.2d at 650 (quoting Liberty Nat'l Life Ins. Co. v.McAllister, 675 So.2d 1292, 1297 (Ala. 1995)). This language in Kendrick
is a direct quote from Hicks v. Globe Life Accident Insurance Co.,584 So.2d 458, 463 (Ala. 1991), and the Hicks standard is inapplicable to this case because Foremost Insurance Co. v. Parham, 693 So.2d 409 (Ala. 1997), abolished the Hicks standard as to all fraud claims filed after March 14, 1997.[6]
In Foremost, we reinstated important, historical principles regarding the law of fraud in Alabama, including the proper standard for evaluating when the statutory limitations period commences:
 "Claims of fraudulent misrepresentation and suppression are subject to a two-year statute of limitations. Ala. Code 1975, § 6-2-38(l). Prior to Hickox v. Stover, 551 So.2d 259 (Ala. 1989), and Hicks v. Globe Life Accident Ins. Co., 584 So.2d 458
(Ala. 1991), this Court had held that a fraud claim accrued, thus commencing the running of the statutory limitations period, when the plaintiff discovered the fraud or when the plaintiff should have discovered the fraud in the exercise of reasonable care. Parsons Steel, Inc. v. Beasley, 522 So.2d 253 (Ala. 1988); Moulder v. Chambers, 390 So.2d 1044 (Ala. 1980); Jefferson County Truck Growers Ass'n v. Tanner, 341 So.2d 485 (Ala. 1977). . . .
"`. . . .
 "However, in Hicks, a plurality of this Court rejected the long-standing rule that our objective standard of reviewing the statute of limitations issue in fraud cases incorporated the duty to read a document upon its receipt or presentation; and it held that `[t]he question of when a plaintiff should have discovered fraud should be taken away from the jury and decided as a matter of law only in cases where the plaintiff actually knew of facts that would have put a reasonable person on notice of fraud.' 584 So.2d at 463. (Emphasis in Hicks.) Hicks was a natural and predictable extension of Hickox, which had been decided less than two years before. In Hickox, this Court, by a vote of five to three, adopted what has become known as the `justifiable reliance standard.' . . .
". . . . *Page 1195 
 "There has been a tension among the Justices on this Court ever since the 140-year-old standard for determining the reliance issue in fraud cases was changed in Hickox. . . .
"`. . . .
 "After careful consideration, we conclude that the `justifiable reliance' standard adopted in Hickox, which eliminated the general duty on the part of a person to read the documents received in connection with a particular transaction (consumer or commercial), should be replaced with the `reasonable reliance' standard most closely associated with Torres v. State Farm Fire Casualty Co., 438 So.2d 757
(Ala. 1983). . . .
 "For the foregoing reasons, we overrule Hickox, to the extent that it changed the law of fraud as it had existed prior thereto. Furthermore, we overrule Hicks, to the extent that it changed the standard that had previously existed for determining the statute of limitations issue in fraud cases. Because this return to the reasonable reliance standard represents a fundamental change in the law of fraud, we think it appropriate to make the new standard applicable in all fraud cases filed after the date of this decision, i.e., all cases filed after March 14, 1997."
Foremost, 693 So.2d at 417-21.
The changes in the law of fraud brought about by our decision inForemost are not mere word games; rather, Foremost signifies a real, substantive difference in the standards to be applied to fraud cases filed after March 14, 1997. For such cases, and contrary to Abston's assertions in his brief, § 6-2-3 does not "save" a plaintiff's fraud claim so that the statutory limitations period does not begin to run until that plaintiff has some sort of actual knowledge of fraud. Instead, under Foremost, the limitations period begins to run when the plaintiff was privy to facts which would "provoke inquiry in the mind of a [person] of reasonable prudence, and which, if followed up, would have led to the discovery of the fraud." Willcutt v. Union Oil Co., 432 So.2d 1217,1219 (Ala. 1983) (quoting Johnson v. Shenandoah Life Ins. Co.,291 Ala. 389, 397, 281 So.2d 636 (1973)); see also Jefferson County TruckGrowers Ass'n v. Tanner, 341 So.2d 485, 488 (Ala. 1977) ("Fraud is deemed to have been discovered when it ought to have been discovered. It is sufficient to begin the running of the statute of limitations that facts were known which would put a reasonable mind on notice that facts to support a claim of fraud might be discovered upon inquiry."). Abston's claims against Auto-Owners were filed after March 14, 1997; therefore, his fraud claims are governed by the objective standards reestablished inForemost. When examined under these standards, Abston's fraud claims are time-barred.
It is undisputed that Abston received and, in fact, read Barrett's August 21, 1996, letter. Attached to the letter was a copy of the subrogation agreement, which Abston had signed. Taken as a whole, that information would make clear to a reasonable person (1) that Auto-Owners had received a request for reimbursement (i.e., payment to someone other than Abston), (2) that the request for reimbursement was for medical expenses that had been paid by Abston's health-insurance carrier (Congress Life); and (3) that this reimbursement was in accordance with the agreement between Congress Life (through CBSA) and Abston, essentially giving Congress Life a right to receive any payments that Abston would otherwise receive resulting from the accident.
Although expressed in terms of misrepresentation and suppression of various specific facts, all of Abston's fraud claims *Page 1196 
are founded on Auto-Owners' decision to pay Congress Life rather than Abston or the medical providers directly. Based on the information Abston received from Barrett, Abston was privy to facts that would provoke inquiry[7] in the mind of a person of reasonable prudence, which, if followed up,[8] would have easily led to the discovery of Auto-Owners' intention to pay, and its eventual payment to, Congress Life. Therefore, the two-year statutory limitations period on Abston's fraud claims began to run on Abston's receipt of Barrett's August 21, 1996, letter, and expired before May 6, 1999, when Auto-Owners was added as a defendant.[9]
Because Abston's fraud claims are time-barred, Auto-Owners was entitled to a judgment as a matter of law with respect to those claims. However, for the sake of completeness, and to assist the bar with respect to future similar claims, we address the merits of Abston's fraud claims.
 B. Fraudulent Misrepresentation
As stated above, Abston argues that Auto-Owners fraudulently misrepresented (1) that under his policy, medical benefits would be paid to Abston in the event an insured incurred medical expenses as the result of an insurable event, and (2) that Barrett was going to "determine the circumstances," as indicated in his August 21, 1996, letter. In order to survive a motion for a judgment as a matter of law with respect to the fraudulent-misrepresentation claims, Abston was required to present substantial evidence of each of the following elements: (1) that Auto-Owners made a false representation; (2) of a material existing fact; (3) on which Abston reasonably relied; and (4) which proximately caused injury or damage to Abston. Smith v. Smith, 820 So.2d 64 (Ala. 2001). We hold that Abston failed to meet his burden of proof so as to avoid a judgment as a matter of law.
The first misrepresentation Abston alleges occurred is found in the contractual language of the policy itself: Auto-Owners stated that it would "pay reasonable expenses" for medical services. In order to maintain this claim, Abston must first demonstrate that this "representation" (which is basically a promise to perform in the future[10]) was false. Logically, if *Page 1197 
Auto-Owners actually performed this obligation (i.e., did not breach the contract), then Abston cannot demonstrate that the statement was "false." Therefore, because we hold that Auto-Owners was entitled to a judgment as a matter of law with respect to Abston's breach-of-contract claim based on the same policy language, Abston cannot maintain this claim of fraudulent misrepresentation.
Abston next claims that Barrett promised to "determine the circumstances under which Congress Life was requesting payment" in his August 21, 1996, letter. (Abston's brief at 28-29.) In other words, Abston claims that the language in the letter meant that, notwithstanding the subrogation agreement signed by Abston, Barrett was promising to verify that Congress Life had a valid claim to the money.
However, while Abston argues at length that Barrett did not review the Congress Life policy and that he did not act to verify the validity of Congress Life's right to reimbursement, Abston offers no substantial evidence that this is what the phrase "determine the circumstances" meant. Instead, the letter (and the lack of contrary evidence) seems clearly to indicate that Barrett wanted to determine whether, under the circumstances, Auto-Owners' duty to pay under the policy had arisen. This is why Barrett asked Abston to fill out a statement-of-accident form and a medical-authorization form "in order [to] determine the circumstances":
 "Mr. Abston, We have received a request for reimbursement of paid medical expenses from Health Insurance (CBSA). In order [to] determine the circumstances, I need for you to complete the enclosed statement of accident and return it to me. Complete both sides. Also complete the enclosed Medical Authorization and return it. We will request the records pertaining to your 12-30-95 accident from Rush Foundation. If you have any questions call me at (334) 874-6065."
There is no shortage of evidence in the record indicating that Barrett used the materials requested in his letter to Abston to "determine" that Abston's accident properly triggered Auto-Owners' obligation to pay. Perhaps the best evidence of this is the fact that Auto-Owners actually paid; in fact, Auto-Owners paid $2,000 — the maximum amount it was obligated to pay under the policy. Without substantial evidence that Barrett meant what Abston claims he meant, Abston cannot demonstrate "falsity," and, therefore, cannot maintain his claim of fraudulent misrepresentation.
 C. Fraudulent Suppression
Abston's fraudulent-suppression claim is based upon the fact that Barrett never informed Abston that a payment had been made to Congress Life. A claim of fraudulent suppression requires substantial evidence of "1) a duty to disclose the facts, 2) concealment or nondisclosure of material facts by the defendant, 3) inducement of the plaintiff to act, and 4) action by the plaintiff to his injury." Foremost, 693 So.2d at 423. Because Abston identifies no specific duty on the part of Auto-Owners to inform Abston of its payment of the $2,000 to Congress Life, Auto-Owners was entitled to a judgment as a matter of law. *Page 1198 
In his brief, Abston provides little substantive argument detailing how a duty existed between Auto-Owners and Abston so that Auto-Owners should have notified Abston when it made the payment. Abston merely restates his contentions (that have already been dealt with above) (1) that Barrett did not "determine the circumstances" as he allegedly promised he would do, (2) that Barrett "gave Abston's money to Congress Life," and (3) that the payment did not reduce Abston's medical bills. From this, Abston concludes that "there can be no reasonable question but that Barrett had a duty and obligation to inform Abston that he intended to make payment to Congress Life." (Abston's brief at 26.) With virtually no explanation, Abston appears to contend that this conclusion is compelled by our decision in State Farm Fire Casualty Co. v. Owen,729 So.2d 834 (Ala. 1998). While Owen does set forth the relevant factors to be considered when analyzing the question of the existence of duty to disclose, we find Abston's conclusory treatment of the issue unpersuasive.
In Owen, we noted that whether a duty to disclose exists requires consideration of "(1) the relationship of the parties; (2) the relative knowledge of the parties; (3) the value of the particular fact; (4) the plaintiff's opportunity to ascertain the fact; (5) the customs of the trade; and (6) other relevant circumstances." 729 So.2d at 842-43. We also noted that "in practically any transaction, particularly those involving specialized areas like insurance, one party will have greater knowledge than the other. . . . `Superior knowledge of a fact, without more, does not impose upon a party a legal duty to disclose such information.'" Id. at 843 (quoting Surrett v. TIG Premier Ins. Co.,869 F. Supp. 919, 925 (M.D.Ala. 1994)).
Under the facts of this case, we fail to find substantial evidence that Auto-Owners had a duty to disclose. It is uncertain whether Barrett had significantly superior knowledge of the decision to pay Congress Life, because Barrett informed Abston that such a transaction was at least being considered. Furthermore, given Barrett's knowledge of Abston's assignment to Congress Life of the right to receive all payments, it is difficult to see how Barrett would be under a duty to then inform Abston that a payment had been made. Additionally, as discussed above, Abston had an easily available means to ascertain the facts regarding the payment to Congress Life. There is no evidence that Abston could not have telephoned Barrett at any time using the telephone number provided Abston in Barrett's letter.
We find that there was no substantial evidence of a duty on the part of Auto-Owners to disclose to Abston its payment to Congress Life. Therefore, Auto-Owners was entitled to a judgment as a matter of law with respect to Abston's fraudulent-suppression claim.
 III. Conclusion
Based on the above, we hold that Auto-Owners was entitled to a judgment as a matter of law as to all of Abston's claims, and that the trial court erred in submitting these claims to the jury. We therefore reverse the judgment of the trial court and render a judgment in favor of Auto-Owners.
REVERSED AND JUDGMENT RENDERED.
See, Lyons, Brown, Woodall, and Stuart, JJ., concur.
Johnstone, J., concurs in part, concurs in the result in part, and dissents in part.
Moore, C.J., and Harwood, J., concur in part and dissent in part.
[1] Precisely when Abston learned of the payment is the source of some confusion. At trial, on cross-examination and re-cross, Abston clearly testified that he learned of the payment very soon after he received the letter from Barrett, at about the same time the check was cut (in August 1996). On re-direct, however, he appeared to testify that he learned of this payment at some time after August 1996, and within two years of the date Auto-Owners was added as a party (May 16, 1999).
As stated above, our standard of review requires us to resolve all reasonable doubts in favor of the nonmovant. In the normal instance, where the movant has presented testimony and the nonmovant has presented contrary testimony sufficient to raise a reasonable doubt, our standard of review clearly compels us to consider the appropriateness of a judgment as a matter of law, given the nonmovant's testimony.
However, in this case, it is the nonmovant's own seemingly clear testimony that Auto-Owners relies on. While we are to look at the facts in the light most favorable to the nonmovant, this Court has not decided whether this means that we should completely disregard the nonmovant's own repeated, clear testimony (in favor of less clear testimony) when the clear testimony happens to be unfavorable to the nonmovant. By way of comparison, a party cannot avoid a trial court's summary judgment (which necessarily indicates that a judgment as a matter of law is proper) by simply contradicting earlier testimony. See Continental Eagle Corp. v.Mokrzycki, 611 So.2d 313, 317 (Ala. 1992) (stating that "a party is not allowed to directly contradict prior sworn testimony to avoid the entry of a summary judgment"); Robinson v. Hank Roberts, Inc., 514 So.2d 958,961 (Ala. 1987) ("`When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony.'" Quoting Van T. Jenkins Assocs., Inc. v. U.S. Indus.,Inc., 736 F.2d 656, 657 (11th Cir. 1984)).
We hold that the statutory limitations period began to run when Abston received Barrett's letter (See Part II. A. of this opinion, "Fraud Claims — Statute of Limitations"). If we held that it had not begun to run at that time, then the issue of when Abston learned of Auto-Owners' payment to Congress Life would be very important. Clearly, the limitations period on Abston's fraud claims would have, at a minimum, begun to run at the time Abston had actual knowledge that Auto-Owners had paid $2,000 to Congress Life rather than to Abston or to the medical providers directly. However, given our holding, we reserve resolution of this issue for a later time.
[2] Abston later withdrew his negligence and wantonness claims.
[3] Based upon Abston's repeated representations to Congress Life that, in this case, there was no evidence to support an award of total damages in excess of $74,000 and that Abston would accept no more than $74,000, Congress Life and Abston entered into a pro tanto settlement, pursuant to which Abston released Congress Life from all liability in exchange for $74,000.
[4] The parties dispute how the subrogation agreement should be labeled and what it was actually intended to achieve. However, what is important here is what the agreement did achieve, by its terms. According to its terms, Abston effectively assigned to Congress Life the right to receive payment of benefits for medical expenses stemming from Abston's accident.
[5] In fact, Abston's entire brief is replete with comments that seem to be directed to a great degree to the actions of Congress Life rather than the actions of Auto-Owners. Abston appears to be attempting to intertwine the activities of the two. However, there was no allegation that Congress Life and Auto-Owners were in any way joint tortfeasors or that they were engaged in any sort of conspiracy. When Auto-Owners' activities are examined in isolation, as they must be, the resolution of this case becomes clear.
[6] We note that the use of the Hicks standard in Kendrick was inappropriate. The fraud action in Kendrick was filed in December 1997.Kendrick, 810 So.2d at 648. Therefore, although our decision in Kendrick
was correct, the decision should have been governed by the objective standards set forth in Foremost.
[7] This is especially true in light of Abston's unrefuted testimony that, at the time he received Barrett's letter, Abston knew that there were problems with the payment of some of his medical bills.
[8] Abston's avenue of inquiry was also known to him. Barrett's letter explicitly asked Abston to telephone with any inquiries, and provided a telephone number to be used in the event he had any inquiries.
[9] Abston appears to concede that the date Auto-Owners was added as a defendant (May 6, 1999), rather than the date Abston filed his action against Congress Life and the fictitiously named defendants (November 10, 1997), is the correct filing date for purposes of our statute-of-limitations analysis. The May 6 date is correct, of course, because Abston's May 6 amendment to his complaint would not relate back to the original complaint. Auto-Owners does not fit the description of any of the fictitiously named defendants, and there is no evidence that Auto-Owners received notice of the institution of Abston's action against Congress Life within 120 days after Abston filed his November 10, 1997, complaint. Ala.R.Civ.P. 15(c)(3).
[10] Because this is a promise to perform a future act, Abston would also need to demonstrate substantial evidence that when Auto-Owners made the promise it had the intent not to perform it. As we stated in Ex parteLumpkin, 702 So.2d 462, 466 (Ala. 1997) (quoting Army Aviation Ctr. Fed.Credit Union v. Poston, 460 So.2d 139, 143 (Ala. 1984)):
 "`An additional burden is added to the party alleging misrepresentation in cases which involve a future act or event.
 "`"In order for promises or opinions to constitute fraudulent misrepresentations, there must have been at the time the representations were made an intention not to do the act promised, and such promise or opinion must have been given with intent to deceive. Birmingham Broadcasting Co. v. Bell, 259 Ala. 656, 68 So.2d 314 (1953). A promise, to constitute fraud, must be made with the intent not to perform it. Schwab v. Carter, 226 Ala. 173, 145 So. 450 (1933)."'" *Page 1199