949 So.2d 136 (2006)
William B. JONES et al.
v.
KASSOUF & COMPANY, P.C., et al.
1040989.
Supreme Court of Alabama.
May 12, 2006.
Rehearing Overruled July 21, 2006.
*137 Jean Brown, Montgomery; and Lloyd W. Gathings of Gathings Law, Birmingham, for appellants.
Robert M. Girardeau and Jeffrey N. Windham of Huie, Fernambucq & Stewart, LLP, Birmingham, for appellees.
WOODALL, Justice.
Dr. William B. Jones, Dr. Larry E. Dye, Dr. O.W. Clayton, and Dr. Thomas H. Allen (collectively "the doctors") appeal from a summary judgment for Kassouf & Company, P.C., L. Paul Kassouf, Gerard J. Kassouf, David P. Kassouf, Jerry D. Callahan, Jr., Robert E. Hoomes, and Wesley Brown (collectively "Kassouf"), in the doctors' fraud action against Kassouf. We affirm.
"[I]n reviewing a summary judgment, the court must accept the tendencies of the evidence most favorable to the nonmoving party and must resolve all reasonable factual doubts in favor of the nonmoving party." Hollis v. City of Brighton, 885 So.2d 135, 140 (Ala.2004). Therefore, the following facts are stated in the light most favorable to the doctors.
Kassouf & Company, P.C., is an accounting firm whose offices are located in Birmingham. Kassouf & Company offers a wide range of accounting and financial services to its clients. Kassouf & Company has a "Professional Services Group" ("the group"), which deals primarily with healthcare professionals, architects, and engineers.
From 1969 through October 1997, Vernon Kreider was employed by Kassouf & Company as an accountant. In October 1997, Kreider retired because of a medical disability. During his entire employment by Kassouf & Company, Kreider worked *138 in the group, which was directed by Gerard J. Kassouf. Among the many services the group offered to Kassouf & Company's clients were services relating to the clients' investments.
At all relevant times, each of the doctors was a client of Kassouf & Company. Kassouf & Company's services to the doctors were provided by the group and, more specifically, by Gerard Kassouf and Kreider. Each of the doctors dealt primarily with Kreider, and each believed that all of his dealings with Kreider were within the scope of Kreider's authority to act for Kassouf & Company.
According to the doctors, Kreider "used his professional position, his employer's company name and offices, the relationship his employer placed him in [with them], and [their] confidential financial information obtained through that relationship, to conduct a scheme by which he defrauded [them] of over $3,500,000." Doctors' brief, at 8-9. This alleged "scheme" involved investments in two entities  Mortgage Partners and Oversize Outfitters, Inc. According to the doctors, "they were reasonably and in good faith led to believe, from the appearance of authority which Kassouf [& Company] permitted in Kreider, that Kreider was absolutely authorized to place [them] in the investments in question; that they relied on Kreider's investment representations as being representations of Kassouf [& Company]; and that [they] in good faith acted on such belief to their prejudice." Doctors' brief, at 56-57.
In 1988, Dr. Jones, Dr. Dye, and Kreider became partners in Mortgage Partners, which was formed for the purpose of buying and holding mortgages. Kreider, the managing partner, was supposed to have made an initial investment of $60,000, while Dr. Jones and Dr. Dye each initially invested $150,000. Both Dr. Jones and Dr. Dye subsequently invested additional amounts in Mortgage Partners. Kreider was to mail the other partners monthly checks representing the return on their investments. Dr. Jones and Dr. Dye received all scheduled monthly checks until December 1999 or early 2000.
In 1993, Kreider placed Dr. Clayton in his first investment with Mortgage Partners. Dr. Clayton invested $150,000 with Mortgage Partners in 1993 and another $125,000 in 1994. Dr. Clayton received all scheduled monthly checks until February 2000.
"[I]n the summer of 1997, while Kreider was still employed by Kassouf [& Company]," he "lured [Dr.] Allen into investing in Oversize Outfitters, Inc." Doctors' brief, at 16. Dr. Allen was subsequently required to pay loans after Oversize Outfitters, Inc., had defaulted on the loans. On April 7, 1999, Dr. Dye signed a guaranty of payment of a loan made to Oversize Outfitters, Inc. Oversize Outfitters, Inc., defaulted on that loan, which Dr. Dye was obligated to, and did, pay.
On April 11, 2000, the doctors sued Kreider, Mortgage Partners, and Oversize Outfitters, Inc., in the Jefferson Circuit Court. In their complaint, the doctors alleged, in pertinent part, that "Kreider [had] fraudulently obtained funds from [them] based upon [Kreider's false] representations that said funds would be deposited in Mortgage Partners or Oversize Outfitters, Inc., bank accounts and used for the agreed upon business purposes of said entities." The complaint also alleged that Kreider had used the funds he had obtained from the doctors for his own benefit.
On June 4, 2003, the doctors filed a motion for leave to amend their complaint to add Kassouf & Company and certain of its employees as defendants. In their motion, the doctors explained their delay in *139 naming Kassouf as defendant, stating, in pertinent part:
"Plaintiffs were not able to obtain the necessary information to determine that Kassouf & Co. and its partners should be defendants until the last thirty days when Mr. Kreider pled guilty to various criminal fraud charges in federal court arising out of transactions he had with the plaintiffs while he was performing accounting services for them in the employ of Kassouf & Co."
Specifically, in his plea agreement on April 25, 2003, Kreider had agreed to the following:
"The defendant, in about 1988, formed a partnership which allegedly took in investments for the purpose of making mortgage loans at a higher than market interest rate. He solicited investments from doctors who provided investment corpus for interest returns. Kreider spent the investments he received. Before 2000, Kreider mailed the doctors monthly interest checks on their investment. In the Spring of 2000, Kreider failed to mail the interest checks, having spent the investments on himself and failed business ventures."
The trial court granted the doctors leave to amend their complaint to join Kassouf as a defendant.
On June 6, 2003, the doctors amended their complaint to add claims against Kassouf alleging fraud and suppression. The fraud claim is based upon Kassouf's alleged liability for Kreider's false representations concerning the doctors' investments in Mortgage Partners and/or Oversize Outfitters, Inc. In their suppression claim, the doctors allege that Kassouf "fraudulently failed to disclose to [them] that the investments allegedly made on their behalf were not reasonable investments, but were based upon fraudulent misrepresentations of [Kassouf & Company] and [its] agents and employees, and further that [Kreider] was discharged from the employment of [Kassouf & Company] due in part to his activities in making fraudulent `investments' on behalf of the [doctors]."
On August 1, 2003, Kassouf filed a motion to dismiss and motion for more definite statement. This motion was converted to a motion for a summary judgment by the filing of affidavits in support of the motion. See Ala. R. Civ. P. 12(c). The motion was based, in pertinent part, upon Kassouf's argument that the action against it was barred by the applicable statute of limitations. On November 15, 2004, the trial court granted Kassouf's summary-judgment motion. On April 1, 2005, the trial court made its order a final judgment pursuant to Ala. R. Civ. P. 54(b), and the doctors then appealed.
In its order granting Kassouf's summary-judgment motion, the trial court did not mention Kassouf's statute-of-limitations defense. Instead, the trial court addressed substantive issues related to the doctors' claims of fraud and suppression. However, as the doctors note, "this Court can affirm a judgment of the trial court if it is right for any reason supported by the record. Taylor v. Stevenson, 820 So.2d 810, 814 (Ala.2001)." Doctors' brief, at 25-26. Our analysis of this case begins, and ends, with the statute-of-limitations defense.
Fraud actions are subject to a two-year statute of limitations.
"In Alabama, any fraud claim must be brought within two years of the accrual of the claim. Ala.Code 1975, § 6-2-38(l). However, where § 6-2-38(l) has created a bar to a fraud claim, `the claim must not be considered as having accrued until the discovery by the aggrieved *140 party of the fact constituting the fraud.' Ala.Code 1975, § 6-2-3."
Auto-Owners Ins. Co. v. Abston, 822 So.2d 1187, 1194 (Ala.2001). "`"The question of when a party discovered or should have discovered the fraud is generally one for the jury."'" Potter v. First Real Estate Co., 844 So.2d 540, 546 (Ala.2002)(quoting Ex parte Seabol, 782 So.2d 212, 216 (Ala. 2000), quoting in turn Liberty Nat'l Life Ins. Co. v. Parker, 703 So.2d 307, 308 (Ala.1997)). "However, a party will be deemed to have `discovered' a fraud as a matter of law upon the first of either the actual discovery of the fraud or when the party becomes privy to facts that would provoke inquiry in a reasonable person that, if followed up, would lead to the discovery of the fraud." Dickinson v. Land Developers Constr. Co., 882 So.2d 291, 298 (Ala.2003). When examined under these "objective standards," Abston, 822 So.2d at 1195, the doctors' fraud claims against Kassouf are time-barred.
The doctors admit, as they must, that they "learned that Kreider had defrauded them [before] they filed a fraud action against him." Doctors' brief, at 31. They sued Kreider on April 11, 2000, more than three years before they amended their complaint to assert fraud and suppression claims against Kassouf. The doctors argue that "it was not until Kreider's federal indictment was made public that [they] learned for the first time that Kreider's fraudulent investments had occurred while Kreider worked as an accountant at Kassouf [& Company] and had begun in 1988." Doctors' brief, at 34. However, this contention is belied by the undisputed facts surrounding the doctors' dealings with Kassouf and Kreider.
When the doctors sued Kreider, they were fully aware that their investments in Mortgage Partners had begun in 1988, when Dr. Jones and Dr. Dye made their initial investments at the behest of Kreider, an accountant at Kassouf & Company. Also, they knew that "Kreider [had] lured [Dr.] Allen into investing in Oversize Outfitters, Inc., in the summer of 1997, while Kreider was still employed by Kassouf [& Company]." Doctors' brief, at 16. According to the doctors, they always believed "that Kreider was absolutely authorized [by Kassouf] to place [them] in the investments in question, [and] they relied on Kreider's investment representations as being representations of Kassouf." Doctors' brief, at 56-57. Kassouf argues that, before the doctors sued Kreider, the doctors "were aware, or should have been aware, that any fraudulent activity by Kreider related to events which must have occurred during Kreider's tenure at Kassouf [& Company]." Kassouf's brief, at 18. We agree. Indeed, the doctors' initial complaint alleged that they had made investments in Mortgage Partners beginning in 1988 and further alleged that, through such investments, "Kreider [had] fraudulently obtained funds from [the doctors] based upon [false] representations."
In their attempt to avoid the bar of the statute of limitations, the doctors also argue that "Kassouf [had] failed to disclose [to them] its knowledge of Kreider's fraud which Kassouf had clearly discovered in 1997." Doctors' brief, at 30. Kassouf strongly denies that it learned of Kreider's alleged fraud before the doctors sued him. However, even if Kassouf learned of the alleged fraud in 1997, its knowledge would not excuse the doctors' failure to sue Kassouf for more than three years after their discovery of Kreider's fraud and the commencement of an action against him.
Because the doctors' fraud and suppression claims are time-barred, Kassouf was entitled to a judgment as a matter of law. Consequently, we pretermit discussion of the other issues raised by the doctors. *141 For the foregoing reasons, the judgment of the trial court is affirmed.
AFFIRMED.
SEE, HARWOOD, and PARKER, JJ., concur.
NABERS, C.J., and STUART, SMITH, and BOLIN, JJ., concur in the result.
LYONS, J., dissents.
LYONS, Justice (dissenting).
I must respectfully dissent because I believe that the question of the applicability of the bar of the statute of limitations should be determined by a jury. Only by holding the doctors to the allegations of count 7 of the original complaint, as opposed to the inconsistent allegations of the amended complaint, can we say that their claims are barred as a matter of law. For the reasons set forth below, I do not believe we should do so.
The doctors were well aware that Vernon Kreider worked for Kassouf & Company, P.C., when they made their investments in Mortgage Partners and Oversize Outfitters, Inc. Kreider left the employ of Kassouf & Company in October 1997. The first default by Oversize Outfitters on a loan occurred in December 1999, and additional defaults occurred in early 2000. The doctors sued Kreider in April 2000.
The doctors contend that they were, when they filed their original complaint in April 2000, ignorant of any fraud perpetrated by Kreider prior to his leaving the employ of Kassouf & Company in October 1997. The doctors state in their initial brief to this Court: "The plaintiffs did not learn that Kreider's fraud had begun while he was still employed by Kassouf [& Company] until February, 2003, when Kreider was indicted in federal court." (Doctors' brief at 17.) The doctors contend that, because they did not suffer any loss until more than two years after Kreider left the employ of Kassouf & Company, the doctors assumed that no wrongdoing had occurred until after Kreider left his former firm.
Kreider testified in September 2001 during his bankruptcy proceedings that he did purchase the mortgages in which the doctors had invested. The doctors contend that this testimony was consistent with their belief that the fraud did not occur until after Kreider had left Kassouf & Company. Further, the doctors continued to use Kassouf & Company's accounting services after they learned that Kreider had defrauded them. That conduct is consistent with Kassouf & Company's not having knowledge of Kreider's fraudulent activities while he was employed by Kassouf & Company.
The doctors contend that they did not learn that Kreider's fraud had begun while he was still employed by Kassouf & Company until February 2003 when Kreider was indicted in federal court. The doctors amended their complaint to add Kassouf & Company and certain individuals as defendants on June 6, 2003.
The main opinion points to the doctors' undisputed knowledge that the initial investments were made while Kreider was an employee of Kassouf & Company. However, I believe we are impermissibly weighing the evidence if we conclude that such knowledge is the equivalent of knowledge of Kreider's fraud committed during his employment with Kassouf & Company under the circumstances here presented, where the defaults did not occur until over two years after Kreider left the employ of Kassouf & Company. For all that appears, Kreider's illegal activities began after he left the employ of Kassouf & Company.
*142 The main opinion quotes from the doctors' brief, at page 16: "Kreider [had] lured [Dr.] Allen into investing in Oversize Outfitters, Inc., in the summer of 1997, while Kreider was still employed by Kassouf [& Company]." I question whether this statement, with its reference to Allen's having been "lured," should be read as an admission of knowledge of Kreider's fraudulent acts on the part of the doctors at the time they made their investments. It is more properly viewed as counsel's description of activities, written with the benefit of information known when the brief was written but not known when the complaint against Kreider was filed in 2000.
Nevertheless, the main opinion marshals the most damning evidence against the existence of a jury question on the defense of limitations as follows:
"Indeed, the doctors' initial complaint [naming as a defendant Kreider only] alleged that they had made investments in Mortgage Partners beginning in 1988 and further alleged that, through such investments, `Kreider [had] fraudulently obtained funds from [the doctors] based upon [false] representations.'"
949 So.2d at 140. Count 7, drafted in 2000, contains allegations of Kreider's fraudulent conduct while Kreider was an employee of Kassouf & Company. Count 7 alleges:
"Kreider fraudulently obtained funds from [the doctors] based on the representation that said funds would be deposited in Mortgage Partners or Oversize Outfitters, Inc., and used for the agreed upon business purposes of said entities and said misrepresentations were false, were known to be false by Kreider, or Kreider never intended to use the funds for the purposes represented to [the doctors], and were intended to induce [the doctors] to provide the funds to Kreider, and the funds were co-mingled [sic] with funds belonging to Kreider or used for his own benefit."
Those allegations unambiguously relate to Kreider's activities during a time when the doctors well knew that Kreider was an employee of Kassouf & Company. When the doctors amended their complaint with allegations that were inconsistent with their knowledge of Kreider's wrongdoing while he was employed by Kassouf & Company, they did not supersede these allegations. If the allegations of count 7 are available to Kassouf as a judicial admission, then I would concur to affirm the judgment of the trial court.
This issue as to the effect of admissions in pleadings was considered in White v. ARCO/Polymers, Inc., 720 F.2d 1391, 1396 (5th Cir.1983), in which the court stated:
"Normally, factual assertions in pleadings and pretrial orders are considered to be judicial admissions conclusively binding on the party who made them. Myers v. Manchester Insurance & Indemnity Co., 572 F.2d 134 (5th Cir. 1978); State Farm Mutual Auto. Insurance Co. v. Worthington, 405 F.2d 683, 686 (8th Cir.1968); Mull v. Ford Motor Co., 368 F.2d 713, 716 (2d Cir.1966).5 [The defendants/appellees] did not insist on strict adherence to this precept: instead of arguing when the issue came up that it was foreclosed by [the plaintiff's] earlier admissions that he had been dismissed on the final day of the 120-days worked probationary period, they argued that White's computation of the number of days he had worked was incorrect because it omitted days absent. By failing to contend that White's admissions barred his subsequent assertion of the contrary position, they effectively waived the argument that the issue was irreversibly settled. Loose v. Offshore Navigation, Inc., 670 F.2d 493, 498 (5th Cir.1982); Genusa v. *143 City of Peoria, 619 F.2d 1203, 1208 (7th Cir.1980).
"5 Admissions made in superseded pleadings are as a general rule considered to lose their binding force, and to have value only as evidentiary admissions. 3 Moore's Federal Practice & Procedure ¶ 15.08[7] at 15-128 (1982), citing Borel v. United States Casualty Co., 233 F.2d 385, case II (5th Cir.1956). But where, as in this case, the amendment only adds allegations, deleting nothing stated in the prior pleadings, admissions made in the prior pleadings continue to have conclusive effect. Dussouy v. Gulf Coast Inv. Corp., 660 F.2d 594, 601 (5th Cir.1981)."
(Emphasis added.)
The allegations in count 7 are the most compelling basis on which to affirm the judgment of the trial court. Based on what I deem persuasive authority of White v. ARCO/Polymers, Inc., we should view the allegations of count 7 as an admission, not superseded by the amended complaint. But Kassouf did not rely upon the allegations of count 7 as an admission in support of its motion for a summary judgment. Under the rule in White v. ARCO/Polymers, the admission is waived if not relied upon by the adverse party. I therefore do not believe that we can view the allegations of count 7 as conclusive objective evidence of knowledge because Kassouf has waived its status as an admission. Without count 7, I must respectfully dissent from affirming the trial court's summary judgment for Kassouf as to the issue of the defense of the statute of limitations.

On Application for Rehearing
WOODALL, Justice.
APPLICATION OVERRULED. NO OPINION.
NABERS, C.J., and SEE, HARWOOD, STUART, SMITH, BOLIN, and PARKER, JJ., concur.
LYONS, J., dissents.
PARKER, J., files statement of nonrecusal.
PARKER, Justice (statement of nonrecusal).
Alabama citizens are blessed by their ability to select their judges at every level of the judiciary from the district court to the Supreme Court through open and competitive elections rather than through a political selection process. A virtue of the Alabama system is that elected judges are held directly accountable to the people every six years rather than insulated from accountability by lifetime appointments or retention elections that exclude all challengers to appointed incumbents.
No system designed by a human is perfect, of course, and even the best-run, open, and competitive elections will disappoint the supporters of the losing candidate. In our federal and state constitutional republics, however, former electoral opponents in all branches of civil government are accustomed to putting aside their electoral differences to serve in the post-election capacities that Providence has ordained for them. Sometimes such service includes appearing in court in the same case in different roles or supporting opposing candidates in subsequent elections.
The instant case has provided this Court with just such a situation. A counsel for the appellants in this case and I were electoral opponents in 2004. Since then, to my knowledge the first time that we have crossed paths in a judicial proceeding was in the original submission of this case. The appeal was initiated with this Court on April 1, 2005, and the notice of appearance of my former electoral opponent as counsel *144 for the appellants was received by the office of the clerk of this Court on August 15, 2005. Nine months later, on May 12, 2006, this Court, by an 8-to-1 vote, affirmed the lower court's judgment against the appellants.
During the months in which their case was before the Court and my former electoral opponent represented them as counsel, the appellants did not request my recusal from the original appeal  even though they were well aware that I was a member of this Court as well as a former electoral opponent of their counsel. It was only after this Court issued its ruling in their appeal, with an outcome unsatisfactory to the appellants, that they sought my recusal from consideration of their application for rehearing in the case. Consequently, the appellants' motion for recusal is untimely; for that reason alone, it is due to be denied.
Even if the appellants' motion for my recusal had been timely, however, it would nonetheless be denied, because it lacks any allegation of bias or prejudice, and, even if such an allegation had been made, their motion fails to include any evidence in support of such an allegation. In fact, the appellants offer in support of their motion for my recusal only a suggestion of a possible appearance of partiality: "Justice Parker's impartiality toward [the appellants' honorable counsel] might reasonably be questioned. . . ." Motion to recuse at 4. This is simply an insufficient reason for a judge's recusal.
In Alabama, a judge's recusal is not required by the mere accusation of bias unsupported by substantial fact. Wallace v. Wallace, 352 So.2d 1376 (Ala.Civ.App. 1977). Furthermore, a party's or party's counsel's status as a former electoral opponent does not establish the requisite personal bias:
"The appellant argues that the trial court improperly denied his motion to appoint another attorney; he had made that motion on the grounds that his attorney was the judge's political opponent. Defense counsel had intended to run for the office of circuit judge against the judge who presided over this case. Defense counsel argues that the appellant did not get a fair probation revocation hearing because the trial judge was trying to `embarrass and humiliate' his political opponent.
"In Reach v. Reach, 378 So.2d 1115, 1117 (Ala.Civ.App.1979), cert. denied, Ex parte Reach, 378 So.2d 1118 (Ala.1980), the appellant moved the trial judge to recuse himself because defense counsel was a political opponent of the trial judge when the judge last ran for office and because the appellant was defense counsel's campaign manager. The Court of Civil Appeals upheld the trial court's denial of the motion, stating:
"`Canon 3(C)(1) provides in part that a judge should recuse himself in a proceeding in which his impartiality might reasonably be questioned in instances where he has personal bias or prejudice concerning a party. Canon 3(C)(1)(a), Canons of Judicial Ethics (1976). Such prejudice is not presumed. Wells v. Wells, Ala Civ.App., 346 So.2d 442, cert. denied, Ala., 346 So.2d 444 (1977); and it is encumbent on the moving party to prove that the bias is of a personal nature. Pannell v. State, Ala.Crim.App., 356 So.2d 219, cert. denied, 356 So.2d 222 ([Ala. ]1977).'"
Clontz v. State, 531 So.2d 60, 61-62 (Ala. Crim.App.1988) (emphasis added). See also Judicial Inquiry Commission Advisory Opinion 84-219 (Aug. 27, 1984) ("[I]t is the opinion of the [Judicial Inquiry] Commission that the mere fact that a party to a proceeding is represented by the defeated opponent of the judge for judicial office *145 does not require the judge's disqualification."); Advisory Opinion 98-694 (May 15, 1998); Advisory Opinion 98-716 (Dec. 18, 1998); and Advisory Opinion 04-838 (April 8, 2004).
A fundamental presupposition of our judicial system is that, exceptional circumstances aside, a judge is able to decide a case impartially despite past or present contacts with counsel of a party before the judge. By establishing a Supreme Court consisting of nine Justices, Alabama law presumes that those Justices have something of value to contribute to the resolution of a case. Consequently, when a Justice recuses himself or herself unnecessarily, the recusal deprives the parties and the public of the benefit of the Justice's participation and the Justice fails to do the job he or she was elected to do.
Here, the appellants, in an untimely motion, have failed to prove what they have not even alleged, namely, personal bias against their counsel. Nor could they, for it does not exist. In fact, I harbor only best wishes for the esteemed counsel. Accordingly, I decline to recuse myself from consideration of the application for rehearing in this case.