[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-14428

Non-Argument Calendar

_____

JAMES O'SHEA,

                                               Plaintiff-Appellant,

*versus*

OMI HOLDINGS INC.,
HOIST PARTS INC.,
d.b.a. Omi Crane Services,
ROBERT M. BUNNEL,
TOM CODIANA,

                                               Defendants-Appellees.

_____

2                    Opinion of the Court                    21-14428

Appeal from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 2:20-cv-01616-KOB

————————————

Before JORDAN, NEWSOM, and LUCK, Circuit Judges.

PER CURIAM:

James O'Shea appeals the district court's order dismissing his breach of contract, fraud, and declaratory judgment claims. After careful review, we affirm.

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**[1]

In early 2015, Robert Bunnel and Tom Codiana—the chief executive officer and president, respectively, of OMi Holdings, Inc.—approached O'Shea about a potential job. OMi and its subsidiary, Hoist Parts, Inc., engaged in "overhead crane installation, service, parts, inspection, repair[,] and maintenance." O'Shea "was a well-known salesman in the industry." OMi wanted to expand into the southeastern United States and believed O'Shea was "the

---

[1] "We accept the factual allegations in the complaint as true and construe them in the light most favorable to the plaintiff." *Luke v. Gulley*, 975 F.3d 1140, 1143 (11th Cir. 2020) (citation omitted). And we treat the employment offer, employment letter, and employment agreement—which were attached to the motion to dismiss—as incorporated into O'Shea's second amended complaint by reference because they were referred to in the complaint, central to O'Shea's claims, and of undisputed authenticity. *See id.* at 1144 (citation omitted).

right guy to lead the effort" to open and run its new operation in Birmingham, Alabama.

During a series of telephone and email negotiations in late March and early April, O'Shea "raised the issue of ownership" of the new operation; he only had about ten more working years left, he told OMi, and wanted to "control his own destiny." To that end, O'Shea said he had money he could invest in OMi and "was willing to purchase stock." O'Shea also told OMi he was "negotiating with another crane company about coming to work for [them] and buying stock therein." OMi proposed phantom stock, which it told O'Shea would be "the same as, or better, than real stock because [O'Shea] would not have to put up any money."

On March 25, OMi formally offered O'Shea a job managing its "Southeast Aftermarket Operation." According to the employment offer, O'Shea's compensation package would include a base salary plus a "[p]hantom [s]tock arrangement where [O'Shea] would be entitled to 25%" of the operation. The phantom stock arrangement had two components. First, once the operation achieved profitability, O'Shea would receive 25% of its earnings (before interest, taxes, depreciation, and amortization), distributed as often as quarterly. Second, "[i]n the event of an exit of the [operation] by the shareholders[, O'Shea] would be treated the same as the shareholders relative to [his] piece" and thus receive 25% of the purchase price. This initial offer identified as "advantages of [a p]hantom [s]tock arrangement": (1) that "O'Shea d[id] not have to put any money into the deal" and so could simply walk away "[i]f

it crashe[d] and burn[ed]"; and (2) that O'Shea's "distributions" would be "treated as compensation[,] avoiding double taxation."

Although O'Shea "had never heard of phantom stock," he did not seek legal representation. Instead, over the next week, O'Shea and OMi continued negotiating and eventually reached an agreement "memorialized" in a March 31 "Employment Letter." Under the finalized employment agreement, O'Shea's "compensation package in [his] role" as general manager included the base salary as well as a phantom stock arrangement under which, this time, O'Shea "would be entitled to 30% of the Southeast Aftermarket Operation." The phantom stock arrangement again consisted of an earnings-based component, plus his "piece" (that is, 30%) of the purchase price "[i]n the event of an exit of the [operation] by shareholders." The agreement laid out sample calculations of O'Shea's share of hypothetical annual earnings and a hypothetical purchase. The agreement also provided that, "[i]n the event [O'Shea's] employment with OMi cease[d] for any reason, this agreement shall terminate."

The March 31 letter was signed by Codiana on behalf of OMi, and O'Shea signed a substantively identical document labeled "Employment Agreement" and dated April 6, 2015. OMi and O'Shea then started the Southeast Aftermarket Operation, and O'Shea managed it for over five years. During that time, O'Shea was paid the 30% earnings-based distributions under the phantom stock arrangement. But O'Shea was terminated in May 2020, at which point he stopped receiving distributions.

O'Shea sued OMi, Hoist, Bunnell, and Codiana in October 2020. He asserted four claims: (1) breach of contract, based on OMi's failure to pay the 30% earnings-based distributions after O'Shea's termination as well as its "anticipatory breach" of its obligation to pay him 30% of the purchase price of a future sale of the operation; (2) fraudulent misrepresentation, based on OMi's "false and misleading" representations that O'Shea "would be given an ownership interest . . . in the form of phantom stock" and that phantom stock was "the same as or better than actual stock"; (3) fraudulent suppression, based on OMi's concealment of the fact that phantom stock does not vest and that OMi "never intended that [O'Shea] would keep his ownership interest" once terminated; and (4) declaratory judgment, seeking declarations that OMi was obligated to continue paying O'Shea the 30% earnings-based distributions as well as 30% of any future sale of the operation.

The defendants moved to dismiss O'Shea's complaint, which the district court granted. The district court dismissed O'Shea's breach of contract claim against Codiana and Bunnell because the two weren't, individually, parties to the contract.[2] And it dismissed the breach of contract claim as to OMi and Hoist because the plain language of the employment agreement unambiguously granted O'Shea no ownership interest or vested rights that survived his termination. As for O'Shea's fraud claims, the district

---

[2] O'Shea conceded this point before the district court and so does not appeal the dismissal of his breach of contract claim as to Codiana and Bunnell.

court found them time-barred by Alabama's two-year statute of limitations for fraud actions.  The district court also concluded, in the alternative, that O'Shea failed to state a claim for fraudulent misrepresentation—because he alleged neither false statements nor reasonable reliance—or for fraudulent suppression, because the contract clearly addressed the things O'Shea alleged were suppressed and because O'Shea failed to allege a duty to disclose.  Finally, the district court dismissed O'Shea's declaratory judgment claim because his underlying breach-of-contract claim failed.

After the district court denied his motion to alter the judgment, O'Shea timely appealed.

## STANDARD OF REVIEW

We review de novo a district court's dismissal of a complaint for failure to state a claim.  *Luke*, 975 F.3d at 1143.  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (quoting *Echols v. Lawton*, 913 F.3d 1313, 1319 (11th Cir. 2019)).

We also review de novo a dismissal on statute of limitations grounds.  *See United States ex rel. Hunt v. Cochise Consultancy, Inc.*, 887 F.3d 1081, 1085 (11th Cir. 2018).  "A dismissal for failure to state a claim on statute of limitations grounds is appropriate only if it is apparent from the face of the complaint that the claim is time-barred." *Id.* (cleaned up).

## DISCUSSION

O'Shea argues the district court incorrectly interpreted the parties' employment agreement as not conferring a vested ownership interest in the Southeast Aftermarket Operation and thus erred in dismissing his breach-of-contract and declaratory-judgment claims. He also argues that his fraud claims weren't time-barred because they accrued in June 2020, "when [he] first began to discover" OMi's intent not to honor O'Shea's ownership interest after his firing, and that he reasonably relied on OMi's false representations of fact when he signed the employment agreement.

*Breach of Contract and Declaratory Judgment Claims*

Under Alabama law, a plaintiff asserting a breach of contract claim must allege "(1) the existence of a valid contract binding the parties in the action, (2) his own performance under the contract, (3) the defendant's nonperformance, and (4) damages." *S. Med. Health Sys. v. Vaughn*, 669 So. 2d 98, 99 (Ala. 1995) (citations omitted). At issue here is whether O'Shea plausibly alleged OMi's non-performance under the contract.

In Alabama, "[t]he cardinal principle in the interpretation of any contract is that the intention of the parties should control." *U.S. Fid. & Guar. Corp. v. Elba Wood Prods., Inc.*, 337 So. 2d 1305, 1307 (Ala. 1976) (citations omitted). In interpreting a contract, we give words "their clear and plain meaning and . . . presume that the parties intended what the terms of the agreement clearly state." *Pub. Bldg. Auth. of Huntsville v. St. Paul Fire & Marine Ins.*, 80 So. 3d

171, 180–81 (Ala. 2010) (citation omitted); *accord Reeves Cedarhurst Dev. Corp. v. First Amfed Corp.*, 607 So. 2d 184, 186 (Ala. 1992) (citation omitted) (explaining that words in a contract are "given their ordinary meaning").  When a contract is unambiguous—that is, when "only one reasonable meaning clearly emerges," *Reeves Cedarhurst*, 607 So. 2d at 186 (citations omitted)—we must enforce the contract as written, *Pub. Bldg. Auth.*, 80 So. 3d at 180 (citations omitted).

We agree with the district court that the terms of O'Shea's employment agreement unambiguously did not confer a vested ownership interest surviving his termination.  The phrase "phantom stock" was not ambiguous.  At the time the parties signed the contract, the plain meaning of "phantom stock" was "[i]maginary stock . . . credited to a corporate executive account as part of the executive's compensation package." *Phantom stock, Black's Law Dictionary* (10th ed. 2014) (referring reader to "phantom stock plan").  And "phantom stock plan" meant "[a] long-term benefit plan under which a corporate employee is given units having the same characteristics as the employer's stock shares," "termed a 'phantom' plan because the employee does not actually hold any shares but instead holds the right to the value of those shares." *Phantom stock plan, Black's Law Dictionary* (10th ed. 2014).

These definitions make clear that phantom stock isn't actual stock held by an employee.  Instead, it's "imaginary" stock conferred as part of an employee's "compensation package."  It has "the same characteristics as the employer's stock shares"—

meaning it pays out in accordance with the value of the company's actual stock—but without the employee "actually hold[ing] any shares." In short, phantom stock isn't stock ownership. *See id.*; *cf. also Whitt v. Sherman Int'l Corp.*, 147 F.3d 1325, 1327 (11th Cir. 1998) ("Phantom [s]tock programs are designed to provide executives with cash payments equivalent to amounts they could receive under an actual stock option or similar program. Phantom programs are based on 'phantom' or 'hypothetical' shares or units." (cleaned up) (quoting Coopers & Lybrand, Executive Summary of Nonqualified Long-term Incentive Plans, CV01 ALI–ABA 619, 632 (1996))).

This definitional understanding of phantom stock—as not conferring actual stock ownership—is consistent with the contract's other terms. The contract didn't include any form of the word "own" (and the same is true of OMi's initial employment offer). Rather, the contract identified the phantom stock arrangement as part of O'Shea's "compensation package," which also included a salary and commissions. The contract further indicated that O'Shea would receive his 30% earnings-based distributions "in the form of pre-corporate tax compensation." What's more, with respect to a potential future sale, the contract specified that O'Shea "would be treated the same as the shareholders"—indicating that he was distinct from "shareholders." Differentiating O'Shea from shareholders, too, was the contract's promise not to require O'Shea "to share in the initial losses" of the operation.

Importantly, this reading of phantom stock is also consistent with the contract's unambiguous termination provision, which

stated simply: "In the event your employment with OMi ceases for any reason, this agreement shall terminate." This provision made O'Shea's rights under the contract contingent on his continued employment with OMi, and it contained no exception for the phantom stock portion of O'Shea's "compensation package."

In sum, to give effect to every part of the contract—including its broad termination provision—we agree with the district court that the phantom stock arrangement did not vest ownership of actual stock. *Cf. Land Title Co. of Ala. v. State ex rel. Porter*, 299 So. 2d 289, 295 (Ala. 1974) ("[A] contract must be construed as a whole and, whenever possible, effect must be given to all its parts."). Therefore, because the phantom stock arrangement didn't confer on O'Shea a durable ownership interest or vested right, and because the contract provided that the parties' agreement would terminate when O'Shea's employment ended, OMi didn't breach the contract when it ceased paying phantom stock distributions to O'Shea after he was terminated. For the same reasons, OMi also isn't in anticipatory breach as to a payout for any future sale of the operation.

O'Shea argues that the contract's use of the words "piece" and "distribution" demonstrate an intent to confer an ownership interest. Like the district court, we disagree. As to the term "piece," although the contract indeed referred to O'Shea's "piece of the Southeast Aftermarket Operation"—as well as to his "piece of the purchase price" of a hypothetical future sale—the contract

21-14428                Opinion of the Court                11

explained that the reference to his "piece" referred to O'Shea's "*Aftermarket compensation* piece."

As to the term "distribution," the contract provided for O'Shea to "receive 30% of the [earnings] generated by the operation in the form of pre-corporate tax compensation," with "[t]his distribution . . . be[ing] made quarterly, bi-annually, or annually at [O'Shea's option]." "Distribution" means "[t]he act or process of apportioning or giving out." *Distribution*, *Black's Law Dictionary* (10th ed. 2014); *accord Distribute*, Merriam-Webster (defining "distribute" as, in relevant part, (1) "to divide among several or many" or (2)(b) "to give out or deliver especially to members of a group"), https://www.merriam-webster.com/dictionary/distribute [https://perma.cc/P59X-SWFH]. Read in context, this contract provision—outlining payment frequency—plainly used "distribution" in the "giving out" sense rather than in a stock dividend sense.

Next, O'Shea argues that the phrase "phantom stock" was latently ambiguous, such that the district court should've considered the parties' course of dealing—including his clearly communicated desire for an ownership interest and two emails attached to his motion-to-dismiss response—to interpret the phrase as conferring vested ownership. In the first email, O'Shea told Codiana:

> I don't want to get into a lengthy legal document but we need a formal legal description of the terms of ownership . . . . I'm not sure how the [p]hantom stock works but we need to define ownership, distribution of [earnings], distribution at sale of business[,] and survivorship if something happens to me, etc.

In reply, Codiana said, "Sounds to me like we can work out all the details you brought up." This, according to O'Shea, shows that the parties were contemplating "actual ownership in the new [operation], not some fleeting right."

"An ambiguity is latent when the language employed is clear and intelligible and suggests but a single meaning, but some extrinsic fact or extraneous evidence creates a necessity for interpretation or a choice among two or more possible meanings." *Moore v. Penn. Castle Energy Corp.*, 89 F.3d 791, 796 (11th Cir. 1996) (quoting *Thomas v. Principal Fin. Grp.*, 566 So. 2d 735 (Ala.1990)). Alabama law permits a court to consider extrinsic evidence "[i]n making the threshold determination of whether there is a latent ambiguity." *Dupree v. PeoplesSouth Bank*, 308 So. 3d 484, 490 (Ala. 2020) (citation omitted).

The problem for O'Shea is that "a contract is ambiguous only if it is susceptible of more than one *reasonable* meaning." *Black Diamond Dev., Inc. v. Thompson*, 979 So. 2d 47, 50 (Ala. 2007) (cleaned up). And that's not what the emails (or O'Shea's expressed desire for ownership) reveal. The emails don't suggest that "phantom stock" reasonably could've meant actual stock ownership; they reveal that O'Shea didn't *know* what "phantom stock" meant. This distinguishes O'Shea's situation from the cases he cites. *Cf. Smith v. Aikin*, 75 Ala. 209, 210, 213 (1883) (holding "two dollars per thousand feet" latently ambiguous because logging industry used both "log measure[ment]" and "line measure[ment]"); *Med. Clinic Bd. of Birmingham-Crestwood v. Smelley*, 408 So. 2d 1203, 1206 (Ala.

1981) (citations omitted) (holding "according to the plans and specifications prepared by [the architect]" latently ambiguous because parties negotiated with understanding that architect's plan was changing); *Dupree*, 308 So. 3d at 488, 491 (holding certificate of deposit latently ambiguous because of handwritten changes reversing recipients' names and updating recipient to which interest should be attributed, as well as conflicting accounts about donative intent); *Mass Appraisal Servs. v. Carmichael*, 404 So. 2d 666, 668, 672–73 (Ala. 1981) (finding latent ambiguity in main contract provision requiring company to "perform mass appraisal services" required by subcontracts between Carmichael and various Alabama counties because main contract didn't specify services subcontracts would involve).  The district court thus correctly found the contract unambiguous.

Finally, O'Shea argues that a contract's termination doesn't impact rights that have already vested—and so his termination couldn't have taken away his 30% interest in the operation.  He finds especially significant the fact that the contract's example phantom stock payouts calculation contained "no contingency or vesting plan for O'Shea to meet in order to receive the money"— because, "[i]f O'Shea's interest had not vested from the date of his acceptance of the agreement, the example calculation would make no sense."  But O'Shea's argument assumes an ownership interest. He defines vesting as "the point in time when the rights and interests arising from legal *ownership* of a property [are] acquired" and "vested right" as "having the character or giving the rights of absolute *ownership*; not contingent."  And he argues that his rights

"vested when he became owner of 30% of the [o]peration." But, as we've already explained, phantom stock is not stock ownership, so this argument fails.

*Fraudulent Misrepresentation and Suppression*

Alabama's statute of limitations for fraud actions is two years. *Bryant Bank v. Talmage Kirkland & Co.*, 155 So. 3d 231, 235 (Ala. 2014) (citing Ala. Code § 6-2-38(l) (2014)). The statute of limitations begins running either "when the plaintiff discovered the fraud or when the plaintiff should have discovered the fraud in the exercise of reasonable care." *Id.* at 236 (quoting *Auto–Owners Ins. v. Abston*, 822 So. 2d 1187, 1194–95 (Ala. 2001)); *see also* Ala. Code § 6-2-3 (2014) (discovery rule).

Usually, "when a person of reasonable prudence would have discovered the alleged fraud" is a jury question. *Bryant Bank*, 155 So. 3d at 237. But "a party will be deemed to have 'discovered' a fraud as a matter of law upon the first of either the actual discovery of the fraud or when the party becomes privy to facts that would provoke inquiry in a reasonable person that, if followed up, would lead to the discovery of the fraud." *Dickinson v. Land Devs. Constr. Co.*, 882 So. 2d 291, 298 (Ala. 2003) (citing *Abston*, 822 So. 2d at 1195); *accord Jones v. Kassouf & Co., P.C.*, 949 So. 2d 136, 140 (Ala. 2006); *see also Miller v. City of Birmingham*, 235 So. 3d 220, 235 (Ala. 2017) (noting court may decide discovery issue as a matter of law when "the plaintiff *actually knew* of facts that would have put a reasonable person on notice of fraud").

O'Shea says he didn't know until June 2020—when OMi stopped paying the 30% quarterly distributions after terminating him—that OMi misled him (through fraudulent statements and suppressions) into believing the phantom stock arrangement gave him a vested ownership interest in the operation. O'Shea argues that he "had no basis for 'inquiring' about his ownership interest" before then. At the very least, he says, there's a genuine issue of fact about when he should have discovered the fraud—such that dismissal on statute of limitations grounds was inappropriate.

We accept as true O'Shea's allegations that he made clear to OMi that an ownership interest in the new operation was a "prerequisite" to him considering its job offer—to the point where he was willing to invest in the business. But even assuming O'Shea is right that OMi's statement describing phantom stock as "as good as or better than actual stock" (or the contract's use of "language consistent with ownership") could be construed as fraudulently "represent[ing] to O'Shea [that] he would own part of the new [operation]"[3]—or that OMi fraudulently suppressed its intent not to treat O'Shea as a true owner—the undisputed facts show that O'Shea "should have discovered the fraud in the exercise of reasonable care" at the time he signed the contract, or at the very least, when he started receiving the quarterly distributions for the phantom stock. *Cf. Bryant Bank*, 155 So. 3d at 236.

---

[3] O'Shea doesn't argue Codiana's "we can work out all the details" email was among OMi's fraudulent misrepresentations.

First, it's undisputed that O'Shea admitted not knowing what phantom stock was when he signed the contract. He alleged that he'd "never heard of phantom stock before this agreement." And he alleged that, "[d]uring the parties' negotiations, [he] told [OMi] that he did not know how phantom stock worked." Second, the contract described the phantom stock arrangement as part of O'Shea's "compensation package" and provided that OMi would distribute his quarterly 30% payouts as "pre-corporate tax compensation." Third, as noted above, neither the final contract O'Shea signed—nor OMi's employment offer letter—ever used any form of the word "own" in detailing the phantom stock arrangement. Plus, the contract's only reference to shareholders noted that, should they "exit" the operation, O'Shea would be "treated the same as" them for purposes of a post-purchase phantom stock payout. Similarly, the contract said O'Shea wouldn't be required to "share in the [operation's] initial losses"—setting O'Shea apart, under the phantom stock arrangement, from an owner who, as O'Shea puts it on appeal, "would otherwise have to insert capital contributions . . . with other owners."

In sum, O'Shea knew the contract didn't expressly say he'd be an owner of the Southeast Aftermarket Operation. He knew the contract didn't require him to invest like an owner. He knew the contract said he'd be "treated the same as" a shareholder (not that he *was* a shareholder). He knew OMi referred to the phantom stock arrangement repeatedly—in his offer letter and final contract—as "compensation." And, most importantly, O'Shea knew

there was a gap in his knowledge about a key contract term, "phantom stock."

These facts show numerous contradictions between the actual terms of the contract (which didn't mention ownership) and the way O'Shea perceived OMi's representations to him (namely, that he'd be an owner). Such contradictions would've provoked inquiry in a reasonable person—particularly a reasonable person for whom an ownership interest was a critical negotiating point, and particularly in light of the contract's broad termination provision that, on its face, made no exception for the phantom stock arrangement. *Dickinson*, 882 So. 2d at 298. Rather than proceeding in ignorance but hoping "phantom stock" meant actual, vested ownership, a reasonable person would have acted to acquire more knowledge, either through independent investigation or advice of counsel. Yet O'Shea didn't seek legal counsel or otherwise try to learn about phantom stock during the nearly two weeks between receiving OMi's employment offer and signing the contract. Even a cursory inquiry via internet search could have tipped off O'Shea that phantom stock is (like its name sounds) not actual stock and the employment agreement didn't offer him ownership. *See, e.g.*, *Phantom stock plan*, Investopedia (Mar. 28, 2015 7:22:35 PM), http://www.investopedia.com/terms/p/phantomstock.asp [https://perma.cc/ANJ9-N9YA] (A phantom stock plan is "[a]n employee benefit plan that gives selected employees (senior management) many of the benefits of stock ownership without actually giving them any company stock. . . . Rather than getting physical stock, the employee receives 'pretend' stock [which, e]ven though

it's not real, . . . follows the price movement of the company's actual stock, paying out any resulting profits.") [https://web.archive.org/web/20150328072235/http://www.investopedia.com/terms/p/phantomstock.asp].    Had O'Shea inquired, he could've easily discovered the alleged fraud. *See Dickinson*, 882 So. 2d at 298.

These facts warrant but one conclusion:  O'Shea should've discovered the alleged fraud at the time he and OMi entered into the contract, when he knew (1) the terms of the contract, (2) what he perceived OMi to be representing, and (3) that he lacked knowledge about phantom stock. *Kindred v. Burlington N. R. Co.*, 742 So. 2d 155, 157 (Ala. 1999) ("When a claim accrues, for statute-of-limitations purposes, is a question of law if the facts are undisputed and the evidence warrants but one conclusion.").  And so O'Shea's fraud claims accrued no later than when he signed the contract knowing these facts.

At the latest, O'Shea should have reasonably discovered the alleged fraud when he began receiving the quarterly distributions for the phantom stock.  The payment should have put him on notice that he was not receiving actual shares of stock.

Because O'Shea didn't sue until October 2020, more than five years after signing the employment agreement on April 6, 2015, and more than two years after he started receiving the quarterly distributions for the phantom stock, we affirm the district court's conclusion that his fraud claims were barred by Alabama's two-year statute of limitations.  We therefore need not reach the

21-14428                    Opinion of the Court                    19

district court's alternative conclusion that O'Shea failed to plausibly allege his fraud claims.

**AFFIRMED.**